(C. D. 1740)

AIR CARRIER SUPPLY CORPORATION
CARMAS SUPPLY CORPORATION } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 17, 1955)

Barnes, Richardson & Colburn (James F. Donnelly and Edward N. Glad of counsel) for the plaintiffs.

Geo. Stephen Leonard, Acting Assistant Attorney General (William J. Vitale, trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: The merchandise involved in these cases consists of two C–46 Curtiss Wright aircraft, which had been exported to Brazil in 1951, and, while there, had been converted from cargo service to passenger service. On their return in the early part of 1953, they were assessed with duty at 15 per centum ad valorem under paragraph 370 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as airplanes. It is claimed that they are entitled to free entry under paragraph 1615 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, as American goods returned, not advanced in value or improved in condition, or, if it is held that they have been advanced in value or improved in condition prior to importation, that duty should be levied only on the value of the improvements, in accordance with paragraph 1615 (g) of said tariff act, as amended.

At the opening of the trial, counsel for the Government moved to dismiss protest No. 220269–K on the ground that the protestant, Air Carrier Supply Corporation, was not the proper party plaintiff and had no legal authority to file the protest. In support of its position, defendant referred to certain of the official papers and introduced other documents into evidence.

The consumption entry in protest No. 220269–K was made by Aircargo Brokerage Co., importer of record, for the account of Air Carriers Service Corp. On the back of the entry, is a declaration of nominal consignee or agent, executed on February 16, 1953, by the brokerage company, stating that Air Carriers Service Corp. is the actual owner of the merchandise. However, customs Form 3347, Declaration of Owner, executed on September 14, 1953, by Air Carrier Supply Corp. (hereinafter called Supply), states that it is the actual owner of the merchandise (plaintiffs' exhibit 1). On the other hand,

customs Form 129 names Air Carrier Service Corp. (hereinafter called Service) as the ultimate consignee. Furthermore, although the protest itself is in the name of Supply, the notice of appearance is in the name of Service.

Introduced into evidence as defendant's exhibit A is an application for license to import the airplane, giving Service as the applicant. Defendant's exhibit B is a notice of duty and internal revenue tax due, dated June 9, 1953, addressed to Service by the collector of customs.

In order to explain the situation and to rebut the Government's contention that Service and not Supply was the proper party plaintiff, plaintiffs called two witnesses and presented several documents.

Edward L. Lynn, treasurer of a group of corporations, including Service and Supply, testified as follows: Supply is a wholly owned subsidiary of Service, a parent corporation of a group doing business as suppliers in the commercial aviation field. There are three corporations in the group, having the same boards of directors, except that the board of the parent corporation has one member who is not a member of the board of the subsidiary. The business consists of purchasing airplanes and parts and supplying them to customers, technical investigative work in insurance adjuster's surveys, and other technical aviation service. When Supply was organized, it was to be primarily a United States purchasing agent, but both Supply and Service do business with the same customer at the same time. When necessary, Service acts as agent for Supply and *vice versa*. Both are registered with the Department of State for purposes of securing import licenses for aircraft.

The original agreement to purchase the aircraft involved in protest No. 220269–K from its owner in Brazil was oral. It was negotiated at a time when the owner wanted to liquidate its C–46 type airplanes and its relationship with both Service and Supply. An application for license to import the aircraft was made by Service (defendant's exhibit A), but at that time it was not decided which corporation would make the purchase. Supply actually took title, as appears from a bill of sale, dated January 19, 1953 (plaintiffs' exhibit 7). The witness Lynn explained that customs Form 129 showed Service as the consignee, because it was prepared by the seller in Brazil, who knew of Service from having done business with it for a number of years. When it did business with the group, it dealt with Service.

Under date of January 7, 1954, a letter was directed to Supply by the collector of customs, demanding the increased duties due (plaintiffs' exhibit 2). In response, the witness directed the bank used by the corporations to transfer funds to the trust account of Arthur S. Clark, Jr., their attorney, who was to make the payment. The

witness did not know whether the Service or the Supply account was debited for the amount. He explained that Service is usually debited first, with corrections made later. A letter on Service letterhead, signed by E. L. Lynn as secretary of that corporation, directed to Clark, states that a cashier's check in the sum of $27,750 was enclosed. (Plaintiffs' exhibit 8.) [That appears to be the total amount due as · duties on both the aircraft involved herein.] The witness stated that, in this transaction, he considered Supply to be the principal and Service the agent.

Dolores Fritts, an employee of Arthur S. Clark, Jr., testified that, on or about January 25, 1954, she took to the office of the collector of customs at Miami a check and a letter from Clark stating that he was enclosing the check for the duties on the entries involved herein (plaintiffs' exhibits 6–B and 6). She delivered the check to one of the deputy collectors, who gave her a receipt therefor, which appears on plaintiffs' exhibit 6. When she turned over the check, the statement which forms a part of plaintiffs' exhibit 6–A was also handed to the deputy collector. It reads, in part:

Payment under protest of duties demanded in connection with the following entries:

\*     \*     \*     \*     \*     \*     \*

Entry No. M–01267–Air Carrier Supply Corp._____ $12,000.00

Section 514 of the Tariff Act of 1930 provides that liquidations and decisions of collectors shall be final and conclusive unless "the importer, consignee, or agent of the person paying such charge or exaction," shall file a protest in writing within 60 days of such liquidation or decision. Defendant claims that Supply is neither the importer, consignee, or agent of the party paying the duties, and is, therefore, not entitled to file the protest herein.

While section 514 refers to the agent of the person paying the charge, it has been construed to include the principal. *Patchogue-Plymouth Mills Corporation* v. *Durning*, 101 F. 2d 41; *Atlas Fibers Co., Inc.* v. *United States*, 30 Cust. Ct. 247, C. D. 1528, affirmed in 42 C. C. P. A. (Customs) 65, C. A. D. 572. It has also been held that the owner of the merchandise, as well as those named in the statute, may file a protest. *Patchogue-Plymouth Mills Corporation* v. *Durning, supra*; *Samuel E. Bernstein* v. *United States*, 59 Treas. Dec. 870, T. D. 44800.

In the instant case, while the entry in protest 220269–K was made by the broker for the account of Air Carriers Service Corp., and it stated in the declaration that said corporation was the actual owner, it appears from the Declaration of Owner, executed by Supply, the bill of sale, and the testimony of Edward L. Lynn that Supply was the actual owner of the merchandise. The duties were apparently paid in the first instance from the account of Service, but, according

to the uncontradicted testimony, Service was acting as agent for Supply. Proof of agency may properly be made at the trial. *United States* v. *F. L. Kraemer & Co.*, 17 C. C. P. A. (Customs) 448, T. D. 43879; *Samuel E. Bernstein* v. *United States, supra*; *Crown Publishers* v. *United States*, 25 Cust. Ct. 159, C. D. 1278.

In the instant case, Service and Supply were run as one concern, having almost the same boards of directors and having the same treasurer. Service, the parent, was the one known to the seller herein. The entry was made for the account of Air Carriers Service Corp., but the protest was filed by Supply, the actual owner. The duties were paid from the account of Service as agent of Supply. The collector sent one notice of duties due to Service and a subsequent one to Supply. Under these circumstances, the protest was properly filed by Supply, the owner of the merchandise.

Defendant claims, however, that the provisions of section 485 (d) of the Tariff Act of 1930 makes Service, for all intents and purposes, the consignee and declared owner of the merchandise. Said section provides:

(d) A consignee shall not be liable for any additional or increased duties if (1) he declares at the time of entry that he is not the actual owner of the merchandise, (2) he furnishes the name and address of such owner, and (3) within ninety days from the date of entry he produces a declaration of such owner conditioned that he will pay all additional and increased duties, under such regulations as the Secretary of the Treasury may prescribe. Such owner shall possess all the rights of a consignee.

Defendant contends that, to fall within the above section, the owner's declaration must be executed and filed by the party declared as the actual owner in the "Declaration of Nominal Consignee or Agent" and that since Supply was not designated as such owner, it does not possess the rights of a consignee, as prescribed in said section. It may be that the nominal consignee would not be released from liability where the owner's declaration was not executed by the party named by the consignee as owner (*Erskine* v. *United States*, 84 F. 2d 690), but we do not believe the actual owner can be deprived of any of his rights because of the consignee's action. Note, for instance, that, in this case, the consignee's declaration names as owner "Air Carriers Service Corp.," which is not even the correct name of Service. Surely, it could not be claimed that a corporation of that name, if one exists, is the actual owner. Even though no owner's declaration is filed, a party who establishes that it is the owner of the merchandise at the time of entry and has paid the duties is the proper party plaintiff. *Great Lakes Foundry Sand Co.* v. *United States*, 15 Cust. Ct. 256, Abstract 50442, appeal dismissed 33 C. C. P. A. (Customs) 190; *Fred Benioff* v. *United States*, 24 Cust. Ct. 487, Abstract 54389.

Inasmuch as it has been established that Supply was the actual owner of the aircraft at the time of entry, there seems no doubt that it had a right to file the protest herein. The Government's motion to dismiss protest No. 220269–K is denied.

It was agreed at the trial that the customs regulations had been complied with as to the claim of free entry of the aircraft as American goods returned under paragraph 1615 (a) of the Tariff Act of 1930, as amended. It was not agreed, however, that the regulations had been met in connection with the alternative claims under paragraph 1615 (g) that duties should be assessed only on the value of the alterations or that free entry should be allowed on the American materials used. The latter claims have apparently been abandoned by the plaintiffs, since it is stated in their reply brief that the airplanes were not sent to Brazil for alterations or repairs and that the modifications made there could not be considered as such.

The issue before us then is whether the returned aircraft should be classified under paragraph 1615 (a), as amended, which provides free entry for—

Articles, the growth, produce or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

On this point, plaintiffs presented the testimony of the following witnesses:

Cecil B. Edmonds, who testified that he has been the plant manager of the aircraft repair firm known as Aerodex, Inc., Miami, Fla., for the last 4 years and that he has had approximately 17 years' experience in connection with aircraft repair, modification, overhaul, and conversion. His duties include the supervision of the maintenance of large groups of aircraft, including preventative maintenance, periodic maintenance, and overhaul.

Eduardo M. Alvarenga, director of maintenance of Real, S. A., Transportes of Sao Paulo, Brazil (hereinafter called Real), where he is responsible for the maintenance and overhaul of the fleet of airplanes owned and operated by Real. He is a civil engineer, holds a Brazilian certificate as an aeronautical engineer, and has been engaged in the aviation industry since 1940.

William C. Rohan, president of Quipco Associates, a firm engaged in the buying and selling of aircraft and parts, in investigating work for insurance companies, and in acting as advisor to prospective purchasers or sellers of aircraft.

Jack Schopenhauer, superintendent of maintenance of Riddle Airlines, who testified that that company is presently engaged in the airfreight business but that it (or its predecessors) had previously been engaged in military training. He has been in the aviation

industry since 1917 and holds a Civil Aeronautics Administration license as aircraft and engine mechanic and examiner. He has serviced and overhauled about 80 different kinds of aircraft, including Curtiss C–46's.

The testimony of these witnesses may be summarized as follows:

In the latter part of 1950 or the early part of 1951, the aircraft involved herein received an 8,000-hour checkup and overhaul. They were reconditioned to manufacturer's specifications and new engines installed. At that time, both were cargo airplanes, having windows in the fuselage. They met Civil Aeronautics Administration standards. Thereafter, they were flown to Brazil, where they were converted to passenger use by the following operations (defendant's exhibit C):

| | |
|---|---|
| Cabin lining—Labor | Cr $29. 530, 30 |
| Installation of two toilets—Labor | 58. 734, 70 |
| Installation of overhead racks, and air and electric outlets—Labor | 76. 997, 10 |
| Installation of galley—Labor | 26. 685, 10 |
| Installation of Seats—Labor | 14. 765, 20 |
| Modification of floor and door | 88. 590, 90 |
| Seats (U. S. manufacture, Burns Aero Seats, Calif.) (for each double seat) | 13. 772, 00 |
| Aluminum and rivets for hat racks' toilets, galley and modification of floor and door (imported from U. S.) | 95. 550, 80 |
| Floor carpet, fiber glass, materials for cabin lining, etc. (manufactured in Brasil) | 78. 916, 60 |

According to the testimony, about 7½ feet of the floor was modified so that it would be level in flight. The large cargo doors were closed and riveted in place and a small door opened for passenger use. The cabin linings and other items listed above were installed. The planes were then placed in passenger service in Brazil, where they were flown from 800 to 1,000 hours each.

In January or February 1953, the planes were returned from Brazil as passenger aircraft. However, the modifications made in Brazil did not meet the requirements of the Civil Aeronautics Administration (hereinafter called C. A. A.) for passenger-carrying operations in the United States, and they could not be licensed either as passenger or as cargo airplanes until certain changes were made.

An examination of the planes was made by the witness Edmonds, who stated that some of the work done in Brazil had to be undone, that is, it had to be reworked to meet engineering specifications. His firm prepared and submitted an estimate covering such work, the cost being computed at $9,000 per plane. However, the corrective work on the planes and their equipment for passenger use in this country was done by Riddle Airlines at a cost of $50,000 for both planes.

Merchandise is entitled to free entry under paragraph 1615 (a) when it is the growth, produce, or manufacture of the United States and has been returned, without having been advanced in value or improved in condition by any process of manufacture or by other means. Articles may be changed, but not improved, in condition while abroad, provided they have not been so far changed as to become different articles with new names, characters, and uses. *United States* v. *Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981. The first question to be determined, therefore, is whether the imported merchandise is the same merchandise that was exported. *Shell Oil Company of Canada, Limited* v. *United States*, 27 C. C. P. A. (Customs) 94, C. A. D. 68.

It has been held that where a material which has been manufactured into something entirely different, such as tungstic acid in powder form into metal or wire, or recording compound into records, the resultant product, even if less valuable than the exported material, is considered a new article not entitled to free entry as American goods returned. *United States* v. *Tower & Sons, supra*; *United States* v. *Brunswick Radio Corp.*, 22 C. C. P. A. (Customs) 346, T. D. 47374. The same is true where the exported material is processed into two products, one of which is returned. *Shell Oil Company of Canada, Limited* v. *United States, supra*. On the other hand, a material in one condition, such as zinc in sheets, may be returned in another condition, zinc in small pieces, provided there has been no advance in value or improvement in condition. *Burgess Battery Co.* v. *United States*, 13 Cust. Ct. 37, C. D. 866, appeal dismissed 32 C. C. P. A. (Customs) 207.

In the instant case, we have another aspect of this problem. Each of the planes herein went to Brazil as a cargo-carrying Curtiss C–46, having a certain serial number. The planes that came back were passenger-carrying C–46's, having the same respective serial numbers. The fuselage of each plane, the wings, tail unit, and engines had not been changed. The structure had been modified only by closing and riveting the large cargo door and opening a passenger door and by lowering a portion of the floor. Such modifications were not more than changes in condition. However, the interior of the plane had been altered further by the addition of installations equipping it for passenger service. According to the witnesses, the identity of the plane was the same, since the serial number, under which planes are bought and sold, had not been changed, and the modifications did not affect the airworthiness of the ship, but merely added accessories.

In our view, the articles, as airplanes, had not been so substantially changed as to affect their identity. The essential parts, the engines and the structure, remained the same (except for alterations in doors and floors). The additions were accessories, equipping the planes for

passenger rather than cargo usage. By this, the planes had been changed in condition, but they had not been manufactured into new articles. While the witness Edmonds testified that a cargo plane was not good delivery for a passenger plane, he said that a converted plane was not a different plane altogether. He pointed out that some planes could be converted from cargo to passenger service in 30 minutes and that the conversion of a plane does not alter its performance of its basic duties and that its equipment for passenger use does not change its identity. We conclude that the imported planes were the same merchandise as had been exported, but that they had been changed in condition.

The next question is whether or not the value of the articles at the time of importation was greater or the condition thereof better than when exported from the United States. *United States* v. *Bird*, 11 Ct. Cust. Appls. 229, T. D. 38991. Any enhancement in value or improvement in condition of an article in a foreign country is immaterial when it is shown that such enhancement or improvement was removed or destroyed before the article was returned. *South Porto Rico Sugar Co.* v. *United States*, 71 Treas. Dec. 1188, Abstract 36337.

In the instant case, plaintiffs claim that the returned articles were not advanced in value or improved in condition on the following grounds: In 1951, the planes had just received a checkup and overhaul and were licensed to fly by the C. A. A. as cargo airplanes. On their return in 1953, they had been converted to passenger planes, but the modifications made in Brazil did not meet C. A. A. standards, and they could not be licensed to fly until considerable corrective work had been done and approved by the C. A. A.

Leaving other considerations aside, a plane that could not be licensed to fly in its condition, as imported, does not appear to be improved in condition over one which had been licensed to fly. In the instant case, however, the planes, as imported, had been converted to passenger use by certain modifications and additional equipment. The witness Rohan stated that normally such conversion would increase the value of a plane, at least to the extent the C. A. A. approved the installations, and the witness Edmonds said that proper insulation, cabin lining, the installation of toilets, galley, and seats would enhance the value of a plane.

The record herein, although not without discrepancies, indicates that the C. A. A. did accept some of the work done abroad. For instance, the witness Edmonds stated, on direct examination, that the C. A. A. approved the cabin lining, the toilets, the door installation, and the galley. On cross-examination, he stated at one point that the installation of overhead racks, the air and electric outlets, and the modifications of the floor and the door did not meet C. A. A.

requirements. At another point, he said that the overhead racks were all right. The witness Schopenhauer testified that the floor level was not changed, although it was strengthened; that the cabin lining was reused, and the overhead racks were left in the aircraft. He said that the same toilets were used, although a new skin had to be put on the flooring in that section. Apparently, the galley was not changed. Defendant's exhibit C mentions also floor carpet and fiber glass. Whether or not these items were reused does not appear. It is to be noted that such items, as well as the cabin lining, were manufactures of Brazil.

There is also a discrepancy in the record as to the cost of the corrective work required to be done. Edmonds estimated it at $9,000 per plane, but Schopenhauer stated that the actual cost was $50,000 for both planes. Apparently, the work that Schopenhauer's company did, included more than correcting the work done in Brazil. For example, he said that the heating system had been modified to a hot-air system, not approved by the C. A. A., and that the radio equipment was not adequate, but there is nothing on defendant's exhibit C as to those items.

While the work done in Brazil may not have been done in a manner entirely satisfactory to the C. A. A. and some additional items may have been required, it seems clear that, since part of the work and materials were acceptable, to that extent, the planes were advanced toward their ultimate use as passenger planes. Where an article has been changed in condition and advanced one step nearer its intended final form by processes abroad, it is improved in condition and is not entitled to free entry as American goods returned, not advanced in value or improved in condition. *Ford Motor Co.* v. *United States*, 19 C. C. P. A. (Customs) 69, T. D. 44897.

As to advancement in value *per se*, the witness Rohan testified that the market value of these planes in 1951 was about $100,000, and he estimated their worth on their return at $65,000 to $70,000. However, the record shows that the planes were actually sold in 1951 for $60,000 to $65,000 and, on their return, one was appraised at $80,000 and the other at $105,000. The former was actually purchased for $90,000. Rohan stated that there had been a 25 per centum rise in market value prior to September 1950 (which was prior to the sale of the planes to Brazil) and that there had been another increase some time in 1951. This evidence does not establish that the aircraft had not increased in value between 1951 and 1953, but indicates the contrary. Moreover, even assuming that the general rise in market value of aircraft should not be considered in determining whether or not there was an advance in value, it cannot be held from the record herein

that such rise accounted entirely for the advance in value of these particular planes.

We conclude that the airplanes involved herein had been to some extent advanced in value and improved in condition by the work done in Brazil. Therefore, they are not entitled to free entry as American goods returned, not advanced in value or improved in condition, by any process of manufacture or other means. Furthermore, since some of the materials contained in the airplanes, as returned, were of foreign manufacture, it cannot be held that said planes were of American manufacture; they were only partly of American manufacture.

For the reasons stated, the protests are overruled, and judgment will be rendered for the defendant.