AIR CARRIER SUPPLY CORP., CARMAS SUPPLY CORP. *v.* UNITED STATES (No. 4866) [1]

---

[1] C. A. D. 647.

United States Court of Customs and Patent Appeals, April 4, 1957

*Barnes, Richardson & Colburn* (*James F. Donnelly, Edward N. Glad,* and *Eugene F. Blauvelt* of counsel) for appellants.

*George Cochran Doub,* Assistant Attorney General, *Richard E. FitzGibbon,* Chief, Customs Section (*William J. Vitale* and *Richard H. Welsh,* trial attorneys, of counsel), for the United States.

[Oral argument February 14, 1957, by Mr. Blauvelt and Mr. Welsh]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

JOHNSON, Chief Judge, delivered the opinion of the court:

The merchandise involved in this case consists of two C–46 Curtiss Wright Aircraft, which were exported to Brazil in 1951, converted from cargo to passenger service while there, and returned to the United States early in 1953.

The question presented is whether the two aircraft should be assessed with duty at 15 per centum ad valorem under paragraph 370 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, or should be entitled to free entry under paragraph 1615 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, as American goods returned, not advanced in value or improved in condition.

The collector assessed the two airplanes at 15 per centum ad valorem under paragraph 370, as modified, as airplanes. On appeal, 35 Cust. Ct. 173, C. D. 1740, the Customs Court sustained the collector's action. From that decision, the appellants appeal.

Paragraph 370, as modified, reads as follows:

Airplanes, hydroplanes, motor boats, and parts of the foregoing, 15% ad valorem. * * *

Paragraph 1615(a), of the free list, as amended, is as follows:

Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

The facts of this case are relatively simple. The aircraft involved were exported from the United States to Brazil in 1951. At the time of exportation, the aircraft were cargo aircraft. In Brazil they were converted to passenger use, the conversion consisting of: (1) closing and sealing the starboard cargo door and fitting therein an emergency exit; (2) lowering and leveling the cabin floor by eight inches; (3) covering the floor with wood and topping it with battleship linoleum; (4) installation of a galley between the cockpit and the cabin; (5) installation of two toilets; (6) installation of overhead racks and air and electric outlets; (7) installation of additional cabin

lights; and (8) installation of twenty-four double passenger seats. The total cost of converting each aircraft was $20,260.76, the breakdown of the cost being as follows:

| | |
|---|---|
| Cabin lining—Labor | $747. 60 |
| Installation of two toilets—Labor | 1, 486. 95 |
| Installation of overhead racks, and air and electric outlets—Labor | 1, 949. 29 |
| Installation of galley—Labor | 675. 57 |
| Installation of seats—Labor | 373. 80 |
| Modification of floor and door | 2, 242. 81 |
| Seats (U. S. Manufacture, Burns Aero Seats, Calif.) (24 double seats @ $348.66 each double seat) | 8, 367. 84 |
| Aluminum and rivets for hat racks, toilets, galley and modification of floor and door (imported from U. S.) | 2, 419. 01 |
| Floor carpet, fiber glass, materials for cabin lining, etc. (manufactured in Brazil) | 1, 997. 89 |

The conversion was accomplished in accordance with the laws of Brazil, and the planes were placed in passenger service there, where they were each flown from 800 to 1000 hours.

In the early part of 1953, the planes were returned from Brazil as passenger aircraft. These aircraft did not meet the requirements of the Civil Aeronautics Administration (hereinafter called C. A. A.) for passenger-carrying operations in this country. Additional work had to be performed, and some of the work done in Brazil had to be re-done. One firm, Quipco Associates, submitted an estimate covering such work, the cost being computed at $9,000 per plane. The work was actually done by Riddle Airlines at a cost of $25,000 per plane.

The planes were actually sold in 1951 for $60,000 to $65,000 each and, on their return, were appraised at $80,000 and $105,000 respectively. The plane appraised at $80,000 was actually purchased for $90,000.

It appears from the record that during the period 1951–1953, the value of aircraft increased 25% because of the Korean situation.

The lower court held that the work done in Brazil may not have been entirely satisfactory to the C. A. A., but since part of the work and materials were acceptable, to that extent, the planes were advanced toward their ultimate use as passenger planes.

Appellants maintain that the two planes in question, when returned, were of a lesser value and in a worse condition than when exported from the United States since, when exported, they were fully qualified cargo aircraft, licensed to fly in this country, while, upon return, they were not qualified for flight; that corrective work in the amount of $25,000 per airplane was necessitated in order to undo what had been done in Brazil, and to get the airplanes in the condition they were prior to exportation, namely, airworthy and qualified for flight in the United States. Urged as analogous cases are *United States* v.

*Tower & Sons,* 9 Ct. Cust. Appls. 135, T. D. 37981 and *United States* v. *Rubelli's Sons, et al.,* 8 Ct. Cust. Appls. 399, T. D. 37645.

The question of whether merchandise is advanced in value or improved in condition by a manufacturing process is one of fact. *United States* v. *Anderson & Co.,* 2 Ct. Cust. Appls. 350, T. D. 32080. The burden is on the importer to show, as a matter of fact, that there has been no advance in value or improvement in condition in the article for which he is seeking free entry. *United States* v. *Bird,* 11 Ct. Cust. Appls. 229, T. D. 38991. An article may be advanced in value or improved in condition by a step in the manufacturing process, *United States* v. *Anderson & Co., supra;* and this is true even though the step is an intermediate one not placing the article in its completed form. *Ford Motor Co.* v. *United States,* 19 C. C. P. A. (Customs) 69, T. D. 44897.

As was pointed out by the lower court, the record in this case is not without discrepancy. Nor is it completely adequate for a mathematically precise analysis of the many factors involved. An itemized cost breakdown of the $25,000 expended on each aircraft after reimportation into this country, for example, would have thrown a clearer light on the picture.

Three salient facts, however, are well established: over $20,000 was expended in improving each aircraft in Brazil; much of that work and most of the materials were acceptable when the planes were returned to this country; the planes, on return, were appraised or re-purchased at a substantially higher price than that at which they were sold in 1951. These facts, singly and cumulatively, give rise to an inference of improvement.

The foregoing expenditure on each aircraft in Brazil undeniably advanced them in value or improved them in condition for purposes of use there. It is true that upon arrival at the port of entry in this country, they became only partially converted passenger aircraft because of more stringent C. A. A. regulations here. But we think this is a fact to which appellants attach too great a significance. A given aircraft might be greatly improved in condition, at considerable expense to the owner, and yet be "un-airworthy" within the appellants' definition of the term because a minor modification is not approved by the C. A. A. If an airplane is completely refurbished at, say, a cost of $50,000 to the owner, it is improved, even though a cargo door is not properly hinged, or an instrument is improperly installed, or a seat is not properly bolted to the floor, pursuant to C. A. A. regulations in this country. The correction of these defects would entail only a nominal expenditure. The other improvements are not negatived because one component requires further work.

Nor is the importer's expenditure of $25,000 per plane in readying them for passenger use in this country necessarily indicative of a

worsened condition at the time of their return. The record does not make clear how much it normally costs to convert a C–46 cargo aircraft to a passenger plane, nor is it clear why the actual work performed cost $25,000 per plane while a former estimated cost of conversion was $9,000. Suffice it to say, any expenditure subsequent to the work done in Brazil is immaterial unless it was expended in reworking the accessories installed there and is an expenditure added to the normal cost of conversion. Appellants herein have not established that any substantial portion of the $25,000 was so spent.

Of the work done in Brazil, major items were acceptable in this country and remained untouched. Two toilets, installed at a labor cost of $1,486.95, were retained, although modified, the modification consisting merely of securing the containers to the floor and re-painting the surrounding floor area. The galley, installed at labor cost of $675, was also retained. The cabin lining, which, together with fiberglass and the floor carpet cost $1,997, although temporarily removed, was re-used. The overhead racks were also retained. Exhibit C shows that the aluminum and rivets for the toilets, galley, overhead racks and modification of floor and door were imported from the United States at a cost of $2,419. Clearly, a substantial amount of that material was in the retained galley, toilets and overhead racks.

The cabin floor and starboard door need not have been modified for passenger use in this country. These components were sound and acceptable as components of either passenger or cargo aircraft in this country. The work done in Brazil was faulty, resulting in weak spots in both the floor and door; and the importer thus incurred the expense of re-working that which had been done poorly and which was not actually necessary. Witness Schopenhauer, however, who supervised the corrective work done in this country, testified that, though unnecessary, the dropped floor and modified door made the aircraft more comfortable and convenient for passenger service. He further stated the dropped floor improved these particular aircraft. The record shows the floor, as modified, needed only to be strengthened but it is not clear as to what further work had to be done on the cargo door. An unnecessary expense was incurred, but ultimately the importer had a plane which was more comfortable and luxurious than that required by C. A. A. regulations. The work done in Brazil was not, thus, valueless, even though imperfect; for it partially contributed to the value of an airplane whose condition, at least as to the foregoing factors, exceeded minimum standards set by the C. A. A.

The seats, installed at a cost of $8,741.64 (including labor), cabin lights and associated wiring, had to be replaced. These items did not improve the aircraft in condition for purposes of passenger use in this country. It is not, however, seen wherein the installation of the above-

mentioned items substantially worsened the condition of the airplanes. The improvement made in Brazil was simply nullified by virtue of the stricter standards prevailing in this country. The only unnecessary expense imposed upon the importer was the cost of removal of these accessories, and this expense has not been shown to be more than minimal.

Some of the work done in Brazil not only failed to improve the aircraft for purposes of use in this country, but was actually detrimental. The Brazilian floor covering, for example, was marred and unacceptable and the appellants were put to the expense of replacing a component which was sound at time of exportation and need not normally be replaced in the process of converting an aircraft for passenger use. Also, the Portuguese instruments were of no value in this country and had to be replaced with instruments comparable to those in the aircraft at time of exportation.

The record, however, is silent with regard to the cost of replacing these items. Appellant bears the burden of showing that these detrimental factors *effectually nullified* the value of the improvements retained. In our view, that burden has not been sustained.

Lastly, we cannot ignore the fact that these aircraft, sold in 1951 for $60,000, were re-acquired or appraised at a much higher price upon return. One was appraised at $105,000 and the other was purchased for $90,000. A 25% rise in market value only partially accounts for their increase in value, and it is not illogical to assume that the balance of the increase was a result of tangible physical improvement.

In view of the foregoing, we conclude that the aircraft, upon return, were advanced in value or improved in condition and that the principles laid down in *Ford Motor Co.* v. *United States, supra,* can be extended to them, as merchandise advanced one step nearer its intended final form by manufacturing processes abroad.

The cases upon which appellants rely, *United States* v. *Rubelli's Sons, et al.,* and *United States* v. *Tower & Sons, supra,* are distinguishable from the case at bar.

In *United States* v. *Rubelli's Sons, et al., supra,* there was no question of advance in value or improvement in condition; the Government's only contention being that the merchandise imported, hard spelter, was not that which was exported, soft spelter. The material imported was indisputably commercially inferior. It was fit only for remanufacture, and such processing would only reconvert it to its *prior* commercial state. In the instant case, the merchandise returned was repurchased at a higher price, not a lower, and was partially advanced to a status which would make it more valuable commercially than it was prior to exportation.

The same holds true in *United States* v. *Tower & Sons, supra,* in which tungstic acid, produced in the United States, was exported to

Canada in the form of in impalpable yellow powder, and after processing there, was re-imported as an insoluble residue of clay-like material consisting of tungsten, lime and other impurities. The merchandise imported was a commercial by-product and patently showed no improvement in condition or advance in value over that which was exported.

For the reasons hereinbefore stated, the decision of the United States Customs Court is *affirmed.*

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.