**JOANNA WESTERN MILLS COMPANY**

v.

**UNITED STATES (Unitron Import Corp., Party-In-Interest).**

**C.D. 3983; Protest No. 67/83736.**

United States Customs Court,
First Division.
March 30, 1970.

Lamb & Lerch, New York City (David A. Golden and Richard J. Kaplan, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Sheila N. Ziff and Frederick L. Ikenson, New York City, trial attys.), for defendant.

Glad & Tuttle, Los Angeles, Cal. (Edward N. Glad and Robert G. White, Los Angeles, Cal., of counsel), for party-in-interest.

Before WATSON, MALETZ and RE, Judges.

RE, Judge.

The plaintiff, an American manufacturer of plastic window shades has brought this action to protest the classification of certain merchandise imported into the United States. The merchandise, imported from Taiwan in 1967, consists of plastic window shades on wooden rollers. It is conceded that the plaintiff has complied with all of the preliminary statutory prerequisites of section 516(b) of the Tariff Act of 1930, and is therefore properly before the court as an American manufacturer of an article of the same class or kind as the imported plastic window shades.

The plastic window shades in issue were classified as "[c]urtains and drapes * * * and like furnishings" of plastics within the purview of item 772.35 of the Tariff Schedules of the United States, with duty at the rate of 12.5 per centum ad valorem. The plaintiff contends that the merchandise should have been classified in accordance with a 1964 decision of the Treasury Department [99 Treas. Dec. 72, T.D. 56102(45)] as "household articles not specially provided for", of rubber or plastics, under item 772.15 of the Tariff Schedules of the United States, with duty at the rate of 17 per centum ad valorem. Plaintiff asserts that T.D. 56102(45) is binding upon all officers of the Bureau of Cus-

toms, and should have been followed by the classifying officer who passed upon the controverted merchandise.

Plaintiff submits that pursuant to the provisions of section 502(b) of the Tariff Act of 1930, T.D. 56102(45) could not be rescinded even by the Secretary of the Treasury himself, "except in concurrence with an opinion of the Attorney General recommending the same, or a final decision of the United States Customs Court." Hence, the plaintiff contends that since T.D. 56102(45) "has never been legally rescinded, all imported plastic window shades liquidated after its effective date should have been classified under item number 772.15."

Regardless of the legal effect of the Treasury Department's non-compliance with and rescission of T.D. 56102(45), the plaintiff maintains that it was erroneous to classify the imported window shades as "furnishings" under item 772.-35 of the Tariff Schedules of the United States. In plaintiff's view the record establishes that the imported window shades "are articles of utility, chiefly used in or about the household", and are not "furnishings" within the purview of item 772.35. Consequently, plaintiff also contends that, even in the absence of T.D. 56102(45), the imported merchandise, "as articles of utility", should have been classified as household articles of plastics, under item 772.15 or, in the alternative, as articles not specially provided for, of rubber or plastics, under item 774.60 of the Tariff Schedules of the United States.

In summary, whereas the imported merchandise was classified under item 772.35, at the rate of duty of 12.5 per centum ad valorem, plaintiff maintains that it was properly classifiable under either item 772.15 or item 774.60, each providing for a rate of duty of 17 per centum ad valorem. The party-in-interest, the importer of the plastic window shades in issue, and the defendant maintain that the merchandise was properly classified, and urge that the classification be upheld and that the protest be overruled.

The competing provisions of the Tariff Schedules of the United States may be set forth as follows:

*Classified under:*

Item 772.35

"Curtains and drapes, including panels and valances; napkins, table covers, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings; all the foregoing of rubber or plastics ...................... 12.5% ad val."

*Claimed under:*

Item 772.15

"Articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients; and household articles not especially provided for; all the foregoing of rubber or plastics:

\* \* \* \* \* \* \* \*

Other ................................ 17% ad val."

*Claimed alternatively under:*

Item 774.60

"Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \* \* \* \*

Other ................................ 17% ad val."

At the outset the court must consider the pertinence of section 502(b) of the Tariff Act of 1930 upon the validity of the classification of the merchandise at bar. Section 502(b) of the Tariff Act of 1930, provides:

"No ruling or decision once made by the Secretary of the Treasury, giving construction to any law imposing customs duties, shall be reversed or modified adversely to the United States, * * * except in concurrence with an opinion of the Attorney General recommending the same, or a final decision of the United States Customs Court."

Plaintiff maintains that by virtue of section 502(b), Treasury Decision 56102 (45) of January 31, 1964 could not be rescinded "except in concurrence with an opinion of the Attorney General recommending the same, or a final decision of the United States Customs Court."

Treasury Decision 56102(45), issued on January 31, 1964, provided as follows:

"*Plastics articles. Shade, window.*— A window shade consisting of wood shade roller and plastic sheeting, made into a complete window shade, in chief value of plastic, classifiable under the provision for Household articles not specially provided for of plastics: Other, in item 772.15, TSUS, Bureau letter dated January 8, 1964. (418.-44)" [Emphasis in original.]

The *defendant admits*, and in its brief has conceded, that subsequently, and without either a decision of the United States Customs Court or a concurring opinion of the Attorney General, T.D. 56102(45) was rescinded by the following:

"*Furnishings, of rubber or plastics. shade, window.*—A window shade consisting of wood shade roller and plastic sheeting, made into a complete window shade, in chief value of plastic, is classifiable under the provision for Curtains and drapes * * * and like furnishings * * * of * * * plastics, in item *772.35*, TSUS, and not under the less specific provision for

.,Household articles not specially provided for * * * of * * * plastics: * * * Other, in item *772.15*, TSUS. T.D. 56102(45) rescinded. Bureau letter dated June 21, 1967. (418.44)." [Emphasis in original.] (1 Cust.Bull. 343, T.D. 67–160 (9); see also 1 Cust.Bull. 374, T.D. 67–178.)

Plaintiff contends that in the absence of a "valid reversal" all officials of the Bureau of Customs were under a statutory duty to give effect to T.D. 56102 (45), and were bound to classify imported plastic window shades under the provisions of item 772.15 of the tariff schedules. By virtue of the provisions of section 502(c) of the Tariff Act of 1930 plaintiff maintains that the subsequent rulings of the Treasury Department "were void and inoperative inasmuch as they purported to do that which the Secretary was not empowered to do, to wit, unilaterally reverse or modify the earlier Treasury Department decision [T.D. 56102(45)] adversely to the United States." (Plaintiff's brief, p. 10.) Hence, plaintiff concludes that the failure to have followed the earlier ruling invalidates the action of the customs officials, and "[r]egardless of the correct classification of plastic window shades, the Secretary's unilateral reversal of T.D. 56102(45) was an act performed outside of his legal authority, and therefore null and void." (Plaintiff's brief, p. 11.)

The putative interest of plaintiff which derives from section 502(b), and thus results in justiciability, might be argued on the following bases. First, plaintiff is prejudiced because of the presumption of correctness that attaches to the customs official's action. If the earlier Treasury Decision had been followed, plaintiff would be able to invoke that presumption for action favorable to him. Second, plaintiff is forced into the inconvenience of a lawsuit which would otherwise have been brought by the importer. Third, since plaintiff concededly has standing for other purposes, he can raise any relevant question. These three

contentions are necessarily subsumed in the broader argument that the statute renders void the Secretary's action herein. Therefore, the court proceeds to consider the nature and character of the statute.

Section 502(b) had its origin in the Act of March 3, 1875, 18 Stat. 469. It has remained substantially unchanged, and was designed by the Congress to give "steadiness and permanence to the administration of the Treasury Department." 2 Cong.Rec. 1536 (1874). It is significant that the statute provides that no rulings of the Secretary of the Treasury which construe a law imposing customs duties "shall be reversed or modified *adversely* to the United States" unless the Secretary obtains a supporting opinion of the Attorney General or follows a final decision of the Customs Court. [Emphasis added.] In section 502(b) Congress imposed absolutely no restriction upon the right or duty of the Secretary to modify or reverse prior rulings in a manner that would *increase* the imposition of customs duties, and the Secretary did have this right. See United States v. Cobb, et al., 11 F. 76, 80, C.C.D.Mass. (1882).

■ It is true, of course, that under present provisions of the law no administrative ruling resulting in the imposition of a higher rate of duty than the Secretary of the Treasury shall find applicable to imported merchandise under an established and uniform practice shall be effective until 30 days have elapsed from publication of notice of such ruling in the weekly Customs Bulletins. This limitation of effective date of change of practice which results in an *increase* of duties obviously has no application to the case at bar. 19 U.S.C. § 1315(d); 19 C.F.R. § 16.10(a).

■ Both its clarity of language and legislative history leave no doubt that section 502(b) was concerned with the preservation of the public revenues and was designed to protect the United States. 2 Cong.Rec. 1536–1538 (1874); 3 Cong.Rec. 1302, 1789 (1875); 3 Cong.

Rec. 2240 (1875). If anyone would question that the purpose was to protect the United States it may be added that at the same time that Congress originally enacted what is now section 502(b), and as part of the same legislation, it also enacted provisions which restricted the power of the Secretary of the Treasury to grant refunds. See 18 Stat. 469. The conclusion is therefore inescapable that section 502(b) was enacted solely for the protection of the United States, and was not intended to benefit any designated class of individuals or persons. It was not intended to benefit plaintiff, and plaintiff can reap no advantage from the Secretary's noncompliance. In the words of the Court of Claims, "[t]he beneficiaries on whom Congress focussed were another group altogether." Rough Diamond Company, Inc. v. United States, 351 F.2d 636, 642, 173 Ct.Cl. 15 (1965). See also United States v. Binghamton Construction Co., Inc., 347 U.S. 171, 176–177, 74 S.Ct. 438, 98 L.Ed. 594 (1954); National Electronic Laboratories, Inc. v. United States, 180 F. Supp. 337, 340 (Ct.Cl.1960). In the language of the Supreme Court in Erhardt v. Schroeder, 155 U.S. 124, 129, 15 S.Ct. 45, 46, 39 L.Ed. 94 (1894), the statutory provision under scrutiny was not designed to "afford substantial protection *to the party complaining*". [Emphasis added.] As indicated in an earlier Supreme Court case, the court's attitude might have differed were it to have found otherwise. French v. Edwards et al., 80 U.S. (13 Wall.) 506, 20 L.Ed. 702 (1872).

Cases such as Joseph E. Seagram & Sons, Inc. v. United States, 30 CCPA 150, C.A.D. 227 (1943), lend no support to plaintiff's position, for there the question pertained to the duty of subordinate officials to comply with duly promulgated regulations of the Secretary of the Treasury. Since it has been held that "the reasonable regulations of the Secretary of the Treasury * * * are entitled to and have the force of law", those cases dealt with the consequences of non-compliance with such regulations

by customs officials. Penick & Ford (Ltd., Inc.) v. United States, 12 Ct.Cust. Appls. 432, 437–438, T.D. 40611 (1925). As stated by the Supreme Court of the United States in Sampson et al. v. Peaslee, 61 U.S. (20 How.) 571, 576, 15 L.Ed. 1022 (1858), "the collectors and other officers of the customs are directed to execute the Secretary's instructions relative to the revenue laws; and his decision is declared to be binding and conclusive upon all of them, whenever a difficulty shall arise as to the true construction of those laws." The duty of customs officers to execute and carry into effect instructions of the Secretary of the Treasury pertaining to the revenue laws is set forth in section 502(c) of the tariff act.

In support of its contention that noncompliance with the provisions of section 502(b) renders the action of the Secretary "inoperative", plaintiff cites several opinions of the Attorney General of the United States. For example, in an opinion dated April 7, 1875 (14 Op. Atty.Gen. 559) which interprets section 2 of the act of 1875, it is stated that a decision favorable to the United States " * * * must stand and be recognized by the Secretary of the Treasury as the rule to be followed upon the question therein involved until it is reversed or modified as provided in said section." Id. at 562. The Attorney General therein also noted that "[a]ny decision, rulings, or directions made by any Secretary of the Treasury prior to the passage of said act adversely to the United States may be overruled by the present or any subsequent Secretary of the Treasury, if, in his judgment, they are not correct expositions of the law." Ibid. No court will quarrel with the statements set forth in the cited opinion for they merely enunciate what the statute provides expressly, and that which is reasonably inferable therefrom.

Specifically, the cited opinion of the Attorney General was concerned primarily with the power of the Secretary to refund moneys collected as duties on imports in accordance with a decision

or ruling made or given prior to the passage of the act. The opinion does not venture to assert the legal consequences attaching to the actions of a Secretary of the Treasury who, although he has acted, has not complied with the provisions of the statute. Of course, the question will not arise if the concurrence of the Attorney General is sought and is obtained. See 18 Op.Atty.Gen. 139.

If his concurrence is sought, the Attorney General may decline to concur. Such an instance is found in an opinion of the Attorney General dated December 27, 1932 (37 Op.Atty.Gen. 34). That opinion pertained to a ruling of the Treasury Department holding that an import tax was applicable to certain coal imports. The Treasury Department subsequently sought to reverse the earlier ruling on the ground that coal imports from countries enjoying most favored nations status were exempt from the tax. The Attorney General, quoting section 502(b) of the Tariff Act of 1930, found that the subsequent ruling was adverse to the collection of duties by the United States. In his opinion, he stated that "[t]he fact that [there are] new considerations not before the Treasury when making the original ruling, now adduced to support its reversal, does not take the case out of the statute of 1930." Id. at 41.

Plaintiff, in its brief, relies heavily upon the following statements of the Attorney General:

" * * * what I really have to decide is whether the original Treasury ruling should stand and the importers should be required to institute the litigation to test the question, or whether by administrative withdrawal of the import tax the American producer should be required to act.

"I am of the opinion that the original ruling requiring the payment of the import tax on coal, except where a favorable trade balance exists, should be allowed to stand, so a judicial inquiry may be had on that basis. The

method prescribed by law for the importer to protest and litigate is much simpler and more expeditious than the procedure where the American producer is required to act, and will result in a speedier determination of the question. * * *

"Finally, if it should ultimately be determined that the import tax is payable, the Government would be left in a more advantageous position respecting payment of the tax if the earlier rulings imposing it are adhered to." (37 Op.Atty.Gen. 34, 42–43.)

A careful reading of the opinion of the Attorney General shows that all that the Attorney General did was to decline to concur, and express an opinion on the difficult and sensitive question presented. It was apparent that the question dealt with a possible breach of an international obligation on the one hand, and the possible nullification of an act of Congress levying an import tax on coal, on the other. Hence, the Attorney General concluded:

" * * * I am clearly of the opinion that the proper course is for me to refrain from concurring in the action of the Treasury Department reversing its original rulings and to allow the tax to stand, *in order that the question may be judicially determined* on protest and litigation by the importers." *Id.* at 43. [Emphasis added.]

It can not be disputed that the thrust of the opinion of the Attorney General was that the question therein presented required a judicial determination. The following quotations from that opinion will leave no doubt.

"The question I am confronted with is whether I should * * * concur or refuse to concur in the decision holding these imports are exempt. Whichever way the question were to be decided, it is bound to become immediately the subject of judicial inquiry. If the rulings requiring the import tax on coal to be paid are allowed to stand, the importers will promptly protest and carry the question into the

Customs Court for judicial decision. If the rulings imposing the tax are reversed, the American producers will immediately protest and carry the question into court * * *. An opinion by me on the merits would bind neither the importer, the American producer, nor the courts, and would be quite ineffective to settle the controversy." *Id.* at 42.

The Attorney General's opinion added that:

"There is a long line of opinions of the Attorneys General to the effect that it is not proper for the Attorney General to express an opinion upon a judicial question which is pending in or must ultimately be decided by the courts. 28 Op. 596; 19 Op. 56; 32 Op. 472; 30 Op. 381." *Ibid.*

The opinion concluded with the sentence that the

" * * * Department will offer every facility to the importers to enable them to obtain a speedy judicial decision of the questions involved." (For the litigation which pertains to the subject matter of the opinion of the Attorney General see Domestic Fuel Corp. and George E. Warren Corp. v. United States, T.D. 46455 (1933), aff'd sub nom. United States v. Domestic Fuel Corp. and Geo. E. Warren Corp. [71 F.2d 424], 21 CCPA 600, T.D. 47010 (1934).)

Plaintiff urges that the proper procedure to be followed is set forth in the paragraphs quoted from the opinion of the Attorney General in the case of the import tax on coal, that is, that the litigation ought to be initiated by the importer rather than by the American manufacturer. The procedure proposed therein involves a matter of judgment and policy, and it is not for the court to decide whether it may be the more desirable course to follow.

That at least some of the reasons stated by the Attorney General for the procedure that he suggested, in his previously quoted opinion, would not apply to the case at bar is clear from the facts

set forth by the plaintiff. Apparently for quite some time now, imported plastic window shades have not been classified in accordance with the original ruling, i. e., T.D. 56102(45). Hence, what was said concerning the more favorable position of the government "respecting payment * * * if the earlier rulings * * * are adhered to", would not apply. Also, whether the procedure is "simpler and more expeditious" for the importer or for the American manufacturer to institute appropriate litigation is not relevant here. The American manufacturer has brought appropriate legal action and is concededly properly before the court. It is presumed that all parties will agree that, in the case at bar at least, "a speedier determination of the question" will not be had if the court were to hold that, regardless of the validity of the classification of the merchandise, the Bureau of Customs must revert to classification under the original ruling and await the bringing of an action by an importer in order to reach the question of proper classification.

The question of the classification of the merchandise has been properly raised in the present action by an American manufacturer who admittedly has *locus standi*. The greatest speed in the early resolution of the question will be achieved if the court will decide the merits of the substance of the controversy in the present action.

▆ That the Secretary of the Treasury, as a public official, is to comply with statutory provisions of law is axiomatic. There can also be no doubt that the Secretary is responsible "to superior executive and legislative authority." Perkins et al. v. Lukens Steel Co. et al., 310 U.S. 113, 129, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940). The question presented for judicial determination, however, is the legal effect of an admitted non-compliance with an applicable statutory provision. It may therefore be said that the specific threshold question presented is whether the requirement for the concurrence of the Attorney General in section 502(b), in the traditional language of the courts, is a *directory* or *mandatory* provision of law.

▆ The judicial determination, whether a statutory provision is directory or mandatory, involves a consideration of a variety of factors. More than one hundred years ago, Lord Campbell, sitting as Lord Chancellor, stated that "[n]o universal rule can be laid down for the construction of statutes, as to whether mandatory enactments shall be considered directory only or obligatory with an implied nullification for disobedience. It is the duty of Courts of Justice to try to get at the real intention of the Legislature by carefully attending to the whole scope of the statute to be construed." The Liverpool Borough Bank v. Turner, 30 L.J.Ch. 379, 45 Eng. Repr. 715, 718 (Ch. 1860), aff'd, 1 J. & H. 159, 70 Eng.Repr. 703 (1860).

That the question is invariably a difficult one may be seen by an examination of the large number of cases cited in 2 Sutherland, Statutory Construction, §§ 2801–2804 (3rd ed. 1943). General guidance may be found in a decision of Lord Penzance in the Court of Arches who, in discussing "the distinction between matters that are directory and matters that are imperative", wrote: "I believe, as far as any rule is concerned, you cannot safely go further than that in each case you must look to the subject-matter; consider the importance of the provision that has been disregarded, and the relation of that provision to the general object intended to be secured by the Act; and upon a review of the case in that aspect decide whether the matter is what is called imperative or only directory." Howard et al. v. Bodington, L.R. 2 P.Div. 203, 211 (1877). Clearly, where direct evidence of legislative intent is lacking, "a significant consideration in determining whether a statutory requirement should be given mandatory or directory effect is a comparison between the results to which each such construction would lead." Holbrook v. United States,

284 F.2d 747, 752 (C.A. 9 Cir. 1960). See also Upshur et al. v. Baltimore City, 94 Md. 743, 51 A. 953 (1902).

Notwithstanding the obvious necessity for public officials to comply meticulously with all provisions of law that they are responsible to administer, the court, nevertheless, deems it in the public interest to hold that the statutory requirement in question is of a directory nature only. This does not imply that the legislature intended directory provisions to be disregarded. It does mean, however, that although punctilious observance is expected, the legal consequences of disobedience or non-compliance therewith are not fatal to the official action taken. Such provisions are not mandatory in the sense that failure to comply therewith does not result in the invalidation or rendering void all that has been done by the public official in the execution of his statutory responsibility. To borrow the language of the Supreme Court, Congress in enacting section 502(b) "did no more than instruct its agent[s]," the Secretary of the Treasury, Perkins et al. v. Lukens Steel Co. et al., 310 U.S. 113, 129, 60 S. Ct. 869, 877, 84 L.Ed. 1108 (1940).

A case that illustrates the distinction between directory or mandatory statutory provisions, insofar as they impose requirements upon the actions of public officers, is Erhardt v. Schroeder, 155 U.S. 124, 15 S.Ct. 45, 39 L.Ed. 94 (1894). In Erhardt v. Schroeder, a tobacco importer sued to recover customs duties allegedly unlawfully exacted by the collector. Plaintiff claimed that the collector, in liquidating entries of tobacco, the merchandise therein, had violated section 2939 of the Revised Statutes by failing to have examined and appraised prior to liquidation the required number of entries as provided by that section. Section 2939 expressly provided:

"The collector of the port of New York shall not, under any circumstances, direct to be sent for examination and appraisement less than one package of every invoice, and one package at least out of every ten packages of merchandise and a greater number should he, or the appraiser, or any assistant appraiser, deem it necessary. When the Secretary of the Treasury, however, from the character and description of the merchandise, may be of the opinion that the examination of a less proportion of packages will amply protect the revenue, he may, by special regulation, direct a less number of packages to be examined."

The Supreme Court made particular reference to the situation pertaining to customs duties, and stated:

"In the case of customs duties, however, a party dissatisfied with the classification of imports may apply to the courts to have examined and reviewed everything involving the legality of the demand which has been made upon him by a collector, and statutes containing directions to government officials, as to the manner in which they shall become informed of the dutiable character of merchandise, afford importers an altogether different kind of protection from that just mentioned. At most, a neglect of such provisions operates to no greater disadvantage to a party than to subject him to the necessity of bringing an action which he might not have felt impelled to bring if the tax had been ascertained in the manner prescribed. The unlawful demand of the duty does not conclude his rights, but, at the most, merely lays upon him, the inconvenience of going before a tribunal in which those rights will be declared.

"An examination of one package in ten of the merchandise might have shown to the satisfaction of the collector that the importation was of the character the importer claimed it to be; the examination of one package in fourteen may have given the collector a different impression to the disadvantage of the importer. But the proceedings do not necessarily end with the collector's decision, and the importer's rights are not finally fixed

until the character of the goods has been found by the court.

"The protection of the convenience only of a taxpayer is not of such a vital nature as to authorize a court to treat a statute primarily directed to public officers for their guidance, and the substantial protection of the government, as mandatory, and to consider official acts not in strict conformity with the statute as void. The protection must be substantial, and must be intended as a guard of rights or property. Cooley, Tax'n, pp. 215, 216." Erhardt v. Schroeder, 155 U.S. at 129–130, 15 S.Ct. at 46–47.

Having determined that the statute merely contained "directions to government officials", the Supreme Court significantly added:

"In this view, it is apparent that the usual presumption of a legal collection is not changed by the circumstances of this case, and that the burden is upon the importer of overcoming this presumption by proof that the exaction of the duties was unlawful." Id. at 130, 15 S.Ct. at 47.

It is true that the plaintiff in Erhardt v. Schroeder was an importer and not an American manufacturer. This, however, does not seem to be a vital difference. Pursuant to statutory authorization, both have standing to sue to raise the question of the legality of the classification.

Plaintiff, in the case at bar, states that, in a situation where a decision is made by the Secretary of the Treasury adverse to the United States, the only aggrieved parties are the American taxpayer and the American manufacturer of similar products. He further states that the taxpayer "has no judicial remedy whatsoever", and the American manufacturer's remedy is not as readily available or expeditious as that of an aggrieved importer. (On the question of the taxpayer's standing, see Flast et al. v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). On the general question of standing, see Association of Data Processing Service Organizations, Inc., et al. v. Camp et al., where the Supreme Court said: "Where statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action. The whole drive for enlarging the category of aggrieved 'persons' is symptomatic of that trend." 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (March 3, 1970). Regardless of the merits of such contentions in other cases they are not valid in the case at bar. Here, the American manufacturer is already legally before the court, and has properly raised the issue of the proper classification of the imported merchandise. This action fully protects not only the interests of the American manufacturer, but also those of the United States and the importer.

It may also be well to add that, under the circumstances presented, no particular significance is attached to the fact that section 502(b) employs the word "shall" in referring to a reversal or modification of a ruling adversely to the United States. The question has been examined and it has been held that "in cases involving prospective action of government officials, the word 'shall' may be given a merely directory meaning if the law's purpose is rather the protection of the government by guidance of its officials than the granting of rights to private citizens affected." Triangle Candy Co. et al. v. United States, 144 F.2d 195, 198 (C.A. 9 Cir. 1944). See also People v. DeRenna, 166 Misc. 582, 2 N.Y.S.2d 694, (1938).

Consequently, for the reasons set forth herein and in Erhardt v. Schroeder, the court holds that the provisions for the concurrence of the Attorney General in section 502(b) are of a directory nature only. Non-compliance therewith did not conclude plaintiff's rights, but merely made necessary "the inconvenience of going before a tribunal in which those rights will be declared." 155 U.S. at 129, 15 S.Ct. at 47. See also Phillips et al. v. Commissioner of Internal

Revenue, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931).

The court's holding that the provisions of the statute are directory in no way injures or prejudices the substantive rights of the parties to require that customs officials properly classify the imported merchandise. The jurisdiction of this court to determine the proper classification of the controverted merchandise, having been properly invoked, is in no way affected by the failure of the Secretary of the Treasury to comply with the provisions of section 502(b). See Borneo Sumatra Trading Co., Inc. v. United States, 56 Cust.Ct. 166, 175, C.D. 2624 (1966) (pending decision on rehearing).

At the trial plaintiff called three witnesses, the party-in-interest called one, and defendant called none. Plaintiff introduced into evidence, as exhibits 2 and 3, two plastic window shades mounted on a wood spring-activated roller. These are window shades manufactured by the plaintiff, and in the words of plaintiff's counsel, are "the prototypes upon which this American manufacturer's protest is based." Exhibit 2 is a translucent shade which permits some light to come through, whereas exhibit 3 is of a room-darkening type. The party-in-interest introduced exhibits A and B which consisted of illustrative samples of the imported plastic window shades that are the subject of the protest before the court.

Plaintiff's first witness was its general sales manager who established his familiarity with the sale and use in the United States of plastic window shades similar to exhibits 2 and 3. He also testified that he has seen such window shades used throughout the United States, "to provide privacy and give light control." He testified that they are strictly functional, and that they are not decorative or ornamental. Although he characterized the window shades in question as "functional", and curtains and drapes as "decorative", he admitted in cross-examination that, when drawn, curtains and drapes also provide privacy and some light control.

Plaintiff's second witness, the owner of a company that sells window shades and draperies to the public as retail, testified that shades, such as those in issue, serve no ornamental or decorative purpose. He stated that they are used to insure privacy, control light, or protect draperies from light. In cross-examination he admitted that draperies, when closed, serve the purpose of concealment, giving privacy and light control. He added that the primary purpose of drapes is to decorate or to beautify.

Plaintiff's third witness, who is in charge of installing window shades for a West Coast supplier, supported the testimony of the two prior witnesses, and likewise testified that the purpose of the controverted merchandise was to insure privacy and control light. To his knowledge there was nothing ornamental in the window shades in issue. On cross-examination this witness admitted that certain hospital curtains and certain plastic school drapes are used for utilitarian purposes to exclude light.

The party-in-interest called its president, an importer of window coverings and household items. He has dealt with window coverings since 1926, when, in Montreal, Canada, he had a shop which dealt in window glass, window awnings, and window shades. In 1931, he came to the United States and opened his own shop in New York where he sold, manufactured, installed and delivered window shades. Based upon his forty years of experience with window shades, curtains and drapes, the witness testified that the function of curtains varies with climate and geography. In some areas, curtains control heat and sunlight, whereas in others they would control frost and cold. He testified that the window shades in issue serve as window coverings for people of low income. As window coverings, they were both decorative and functional. He stated that his company imported shades such as plaintiff's exhibits 2 and 3 in white,

and beige, and possibly green. He identified defendant's exhibits A and B as shades of the kind imported by him and covered by the customs invoice. He testified that his company imported such shades in various colors to enable customers to select a color to match the interior of their houses and furnishings. For wealthier customers, his company sold different window coverings, such as decorative shades not in evidence, manufactured by the plaintiff. Upon examining plaintiff's exhibit 3, Mr. Hyman stated that such a shade was used to provide privacy, by shutting out light, and to provide decoration, by adding to a basic window something akin to what a rug would add to a plain floor. He stated that shades are both functional and decorative.

On the question of the proper classification of the controverted plastic window shades, plaintiff indicates that they are not included *eo nomine* in item 772.35 of the Tariff Schedules of the United States. Item 772.35 is a new classification provision, first introduced into the tariff laws with the adoption of the TSUS in 1963, and covers "[c]urtains and drapes, including panels and valances; napkins, table covers, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings; all the foregoing of rubber or plastics." In addition to the omission of window shades from the enumerated articles in item 772.35, plaintiff also asserts that they are not included in the language "and like furnishings" found in that item. In essence, plaintiff contends that the subject plastic window shades are primarily used in a utilitarian or functional capacity to afford privacy and the control of light, whereas curtains, drapes and furnishings are primarily used for decorative or ornamental purposes.

Plaintiff has stressed the distinction between a purpose that is utilitarian with one that is decorative to the point where it has tended to ignore or overlook the facts established by the record. The record establishes beyond question that window shades, as well as curtains and drapes, provide privacy and light control. Furthermore, there is testimony that in addition to privacy and light control, the merchandise in issue also "makes the room more decorative and richer looking, the same as would apply if you put a rug on the floor as against the plain floor." There is likewise testimony that the merchandise is imported in different colors so that customers may make selections "to match the interior of a home and furnishings", and indeed exhibits A and B are each of a different color.

Citing pertinent cases, plaintiff states that "samples are entitled to full weight as potent witnesses", and asserts that: "Examination of exhibit Numbers 2 and 3 reveals that window shades such as those here at issue are in no wise, ornamented or decorated. * * * Unlike certain more expensive types of window shades, not here at issue, the plain plastic window shades involved in this litigation are not decorated or ornamented in any fashion. The testimony and the samples clearly establish that the shades at issue are of plain plastic sheeting * * *." (Plaintiff's brief, pp. 14–15.)

In a case such as the one at bar, where the issue is the proper classification of the imported merchandise, no one can doubt the wisdom of the principle that samples "are most potent witnesses." Marshall Field & Co. v. United States, 45 CCPA 72, 81, C.A.D. 676 (1958). Although the court has very carefully examined the "shades involved in this litigation", i. e., "those here at issue", that examination did not pertain to plaintiff's exhibits 2 and 3, as suggested by plaintiff, but rather to defendant's exhibits A and B. The illustrative samples of the plastic window shades which are "in issue", and are imported by the party-in-interest, are defendant's exhibits A and B. Their examination, including an unrolling of the shades, will show that not only are they different colors, but also that they are patterned or embossed.

In substance, plaintiff contends that the shades at bar are not "furnishings" because they are not ornamental. Citing the cases of Morimura Bros. v. United States, 2 Ct.Cust.Appls. 181, T.D. 31941 (1911), Fabry Associates, Inc. v. United States, 45 Cust.Ct. 88, C.D. 2203 (1960), and certain dictionary definitions, plaintiff states that "[t]he definition of furnishings found in these decisions is consistent with the definitions of the lexicographic authorities, to wit, that furnishings are primarily for decorative or ornamental purposes." (Plaintiff's brief, p. 14.) Plaintiff characterizes the shades in issue as "plain plastic window shades", and presumably might agree that "ornamental" window shades could properly be classified as "like furnishings" under item 772.35 which specifically covers "curtains and drapes". In any event the court deems plaintiff's description of the shades in issue, and the requirement of ornamentation to be without merit. Since variety of colors, and an examination of the unrolled shades suggest adornment, the court cannot agree with plaintiff's characterization of the merchandise.

A most helpful recent decision on the question of ornamentation is the case of Colonial Corp. of America v. United States, 62 Cust.Ct. 502, C.D. 3815 (1969). The question presented was whether a double row of stitching on girls' western style jean shorts transformed the jeans into ornamental wearing apparel. In holding that the stitching served to ornament the jeans and therefore were properly classifiable as "ornamented wearing apparel", within item 382.03 of the Tariff Schedules of the United States, the court stated:

"While we might agree that it sounds somewhat incongruous to describe certain jeans as "ornamented wearing apparel", such a determination, without more, does not resolve the question before us. The general rule is that whether or not an article is "ornamented" or "decorated" is a question of fact to be determined with reference to the particular article be-

fore the court. United States v. Mutual China Co. et al., 9 Ct.Cust. Appls. 232, T.D. 38202. It is the result produced upon the article, and not the method of production, which determines the classification. United States v. Todd & Co., 11 Ct.Cust. Appls. 50, T.D. 38690. Thus several articles which plaintiff might not consider "susceptible of being ornamented" have been found by the courts to be decorated or ornamented. For example, bottle caps (Oscar Heyman & Co. v. United States, 27 Treas. Dec. 316, T.D. 34844) and sprinkler tops (Emile Utard v. United States, 27 Treas.Dec. 399, T.D. 34888) embossed with a design have been held to be decorated; china plates imprinted with a trademark within two concentric circles were held decorated or adorned in United States v. Bernard, Judae & Co., 4 Ct.Cust.Appls. 403, T.D. 32841; earthenware articles which had a glaze of but a single color were held decorated in United States v. L. Straus & Co. [C.C.], 168 F. 569, 17 Treas.Dec. 266, T.D. 29648; agates sliced and partially dyed were held properly classified as earthy or mineral substances, partially maufactured, and decorated, in United States v. N. M. Albert Co. et al., 41 CCPA 191, C.A.D. 549; and pocket-knives on whose handles was etched an arrow with a Delta-wing design inserted within the head thereof were held to be ornamented or decorated in Ralph C. Morton, d. b. a. Southwest Athletic & School Supply Co. et al. v. United States, 54 Cust.Ct. 107, C.D. 2516. Thus the important question is not what is the particular article being ornamented, but rather what is the effect on that article when some additional and non-functional feature is added to it." 62 Cust.Ct. at 504–505.

As a footnote to the first sentence of the above quotation the court noted:

"In our research we have likewise examined several definitions of "decorate", "ornament" and their synonyms and we find nothing inherent in

the definitions themselves to precluded using the term "ornamented" (wearing apparel) in classifying certain jeans. While we are of the opinion that a lengthy examination of these terms is unnecessary here, we note in passing that the word "adorn" is itself defined as, "to render pleasing or attractive" (Webster's New International Dictionary of the English Language, 2nd ed. 1958) which might not be inappropriate to describe the effect produced by the stitching on the jeans in question. (See also Funk and Wagnalls New Standard Dictionary of the English Language, 1952.)" *Id.* at 504.

In support of its criterion or requirement of ornamentation plaintiff relies upon cases decided under the predecessor Tariff Act of 1930 which, under the circumstances, can have but little applicability. As plaintiff notes correctly, the tariff laws contain no precedent for the use of the term "furnishings" in the context in which it is used in item 772.35 of the Tariff Schedules of the United States. The provision for "like furnishings" of plastics is new. In the cases of *Morimura Bros.* and *Fabry Associates, Inc.*, decided under the Tariff Act of 1930, the question was whether the merchandise was "furniture" or "house furnishings". Those cases are not dispositive on the meaning of the word "furnishings" as used in the present tariff schedules. This point was noted in the recent decision of Barth & Dreyfuss v. United States, 62 Cust.Ct. 86, C.D. 3685 (1969). The merchandise in the *Barth & Dreyfuss* case was cotton terry potholders. Plaintiff claimed that the potholders were properly classifiable under the provision for other furnishings of cotton terry under item 366.65 of the tariff schedules. In dismissing inferentially the relevance of those cases decided under the Tariff Act of 1930, and upon which plaintiff herein relies, Judge Wilson in the *Barth & Dreyfuss* case stated:

"The provision for "furnishings" was enlarged in TSUS schedule 3, part 5, subpart C, headnote 1, to embrace: * * * curtains and drapes, including panels and valances; towels, napkins, tablecloths, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings: * * *

Accordingly, the plaintiff's argument in its brief is well taken and the court is satisfied from the record as well as from an examination of exhibit 1, the cotton terry potholder herein, that the imported merchandise constitutes like "furnishings," similar to and *ejusdem generis* with the towels, place mats, napkins, and dish towels enumerated in TSUS schedule 3, part 5, subpart C, *supra.*" 62 Cust.Ct. at 89.

The *Barth & Dreyfuss* case dealt with item 366.65 and subpart C of part 5, schedule 3, of the tariff schedules. It is nevertheless most pertinent on the question presented in the case at bar as to the meaning of "furnishings" under the tariff schedules for the language therein is practically identical to the prefatory language to item 772.35, except for the absence of "towels", and the change from "table cloths" to "table covers", and component material. The confession of judgment by the defendant in the *Barth & Dreyfuss* case in no way affects the court's holding that unornamented potcovers, of obvious utilitarian purpose, constituted "like furnishings" under the tariff schedules.

That the word "furnishings", when used in the tariff schedules, cannot be limited on the basis of the presence or absence of ornamentation may be gleaned from several other provisions of the tariff schedules. Congress has indicated that furnishings may be ornamented as well as unornamented. For example, the superior heading to item 365.00 et seq. states:

"Lace, or net furnishings, whether or not ornamented, and other furnishings, ornamented."

Note also the superior heading to item 366.03 et seq. which states, "[o]ther fur-

nishings, not ornamented" which was found to be applicable to the terry potholders in the *Barth & Dreyfuss* case.

For additional guidance, the court has examined the dictionary definitions of curtains and drapes, two of the articles enumerated in item 772.35 of the tariff schedules, and also the word "shades". That there is a similarity or relationship may be detected from the following definitions:

Webster's Third New International
Dictionary (1965)

"curtain 1a: a piece of material finished with hems, ruffles, pleats, or casings and hung usu. by the top edge on rods or poles at windows or sometimes on beds for decoration, privacy, and control of lights and drafts. b. any similar material that serves to screen, divide, protect, conceal, or decorate * * *."

"drape * * * 2a: a drapery esp. for a window; * * * 3a: arrangement in or of folds * * *."

"shade * * * 7g: a flexible screen usually mounted on a roller and used to obstruct or regulate light passing through a window or to obstruct the view through a window from within or without * * *."

Funk and Wagnalls New Standard
Dictionary of the English Language (1960)

"curtain, n. 1. A draping or covering, hanging loosely, and readily adjustable, variously employed, as to prevent the passage of light through a window or other opening, to screen a stage * * * or to hide some object from view; * * *."

"drape, n. Drapery; draping."

"shade, n. * * * 5. Something that serves to intercept, protect from, or modify the effect of light; * * * specif.: (1) a screen of muslin, paper, or other material, used before a window, usually arranged to be raised and lowered, as distinguished from a window-curtain draped from the sides. * * *."

These definitions show clearly that the articles defined share a common purpose or function in concealing, screening and controlling light. It is the conclusion of the court that the words "like furnishings", in the pertinent provisions of the Tariff Schedules of the United States, are not limited to articles that are ornamented or ornamental. Additionally, since the controverted window shades are used as window coverings to provide privacy and light control, they are *ejusdem generis* with curtains and drapes, and are therefore "like furnishings" within item 772.35 of the Tariff Schedules of the United States.

In view of the foregoing, the court holds that the controverted merchandise was properly classified under item 772.35 of the Tariff Schedules of the United States and that the presumption of correctness that attaches to the collector's classification has not been overcome. Since the plaintiff has not borne its burden of proving that the imported merchandise was erroneously classified, and that the claimed classification is correct, the protest is overruled. Judgment will issue accordingly.