An order will issue accordingly.

(C.D. 4487)

Adolco Trading Co.
Adolco Trading Corp. }[1] *v.* United States

---

[1] "Adolco Trading Co." apparently refers to the company prior to its incorporation. The corporation is referred to in the papers as "Adolco Trading Corp.", "Adolco Trading, Inc." and "Adolco Trading Company, Inc."

Court Nos. 68/65804, etc.

(Decided November 29, 1973)

*Lane, Young & Fox* (*Peter Jay Baskin* of counsel) for the plaintiffs.

*Irving Jaffe*, Acting Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

RAO, Judge: The merchandise involved in these cases, consolidated for trial, is described on the entry papers as "shopping bags." It was imported from Japan, Hong Kong, and Taiwan between March 1968 through July 1970 and was entered at the port of New York.

The merchandise was classified under item 706.60, Tariff Schedules of the United States, at 20 per centum ad valorem, as luggage of plastics. It is claimed to be dutiable under item 774.60, as modified by Presidential Proclamation No. 3822, T.D. 68-9, as articles of plastics, not specially provided for, at various rates depending upon the dates of entry. In all of the actions except Court Nos. 69/8845, 70/20678, and 70/65713 with respect to entry No. 235923, the answers raise the affirmative defense that, alternatively, if the merchandise is not luggage for tariff purposes, it is classifiable as handbags under item 706.60. Plaintiffs' replies deny this. No reply appears to have been filed in Court No. 69/5703.

At the trial defendant was granted leave to amend its pleadings with regard to Court No. 69/8845, to claim that the merchandise should have been classified under item 386.08, as articles of textile materials, not specially provided for, lace or net articles, whether or not ornamented.

The pertinent provisions of the tariff schedules, as modified, are as follows:

Schedule 7, part 1, subpart D

Subpart D headnotes:

\* \* \* \* \* \* \*

2. For the purposes of the tariff schedules—

(a) the term "luggage" covers—

(i) travel goods, such as trunks, hand trunks, lockers, valises, satchels, suitcases, wardrobe cases, overnight bags, pullman bags, gladstone bags, traveling bags, knapsacks, kitbags, haversacks, duffle bags, and like articles designed to contain clothing or other personal effects during travel; and

(ii) brief cases, portfolios, school bags, photographic equipment bags, golf bags, camera cases, binocular cases, gun cases, occupational luggage cases (physicians', sample, etc.), and like containers and cases designed to be carried with the person, except handbags as defined herein;

(b) the term "handbags" covers pocketbooks, purses, shoulder bags, clutch bags, and all similar articles, by whatever name known, customarily carried by women or girls, but not including luggage or flat goods as defined herein or shopping bags;

\* \* \* \* \* \* \*

Luggage and handbags, whether or not
fitted with bottle, dining, drinking,
manicure, sewing, traveling, or similar
sets; and flat goods:
 Of leather:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

 Of unspun fibrous vegetable materials:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

 Of textile materials * * *:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

\* \* \* Of reinforced or laminated plastics__ * * *
 Of other materials:
 Handbags:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

 Flat goods, of metal:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

706.60 Other _____ 20% ad val.

## Schedule 7, part 12

Articles not specially provided for, of rub-
ber or plastics:

| | | | |
|---|---|---|---|
| * * * | Of shellac or copal_____ | * * * |
| * * * | Of natural rubber_____ | * * * |
| ฿ * * | Of casein_____ | * * * |
| * * * | Of vulcanized fiber_____ | * * * |
| 774.60 | Other _____ | 15%, or 13.5% or 11.5% ad val. depending on date of entry |

## Schedule 3, part 7, subpart B

Articles not specially provided for, of tex-
tile materials:
 Lace or net articles, whether or not
 ornamented, and other articles or-
 namented:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

386.08 Other _____ 45% ad val.

At the trial plaintiffs abandoned Court Nos. 68/65804, 69/7629,
69/50143, 69/50144, and 70/20678, and Court No. 69/51817 as to Carton
No. 366, Court No. 69/52229 as to Style No. A 618, Court No. 70/43187
as to Carton Nos. 49/109, Court No. 70/49107 as to Carton No. 1198,
and Court No. 70/60821 as to Style No. 1095. To that extent, the
consolidated action will be dismissed.

In view of the fact that entry No. 235923 in Court No. 70/65713 is
not in the court files and is not available for inspection, defendant

contends that plaintiffs' claim as to the merchandise covered thereby should be overruled for failure of proof. Plaintiffs request that the entry be severed from the action and a continuance granted during which time they would attempt to reconstruct the entry. This request will be granted and plaintiffs given six (6) months from the date of the order of severance to reconstruct the entry and take appropriate steps to dispose of the severed action.

The Government claims that entry No. 517254 in Court No. 70/43188 should be dismissed on the ground that that entry was made by Leonard Satz and the protest was filed by Adolco Trading Co. which was neither the importer of record nor the consignee.

The entry is in the name of Leonard Satz, as importer of record, for the account of Adolco Trading Co. Mr. Satz declared on the entry that

> * * * I am ☒ the nominal consignee and that the actual owner for customs purposes is as shown above * * *.

No owner's declaration was filed. The commercial and special customs invoices list Adolco Trading Co. as the purchaser. At the trial, Adolph Cohn testified that he had been the individual owner of Adolco Trading Co. prior to its incorporation three years ago and since then has been president of the incorporated firm. He said that his company was the importer of the merchandise covered by the invoices involved in this case.

Under section 514, Tariff Act of 1930, a protest may be filed by "the importer, consignee, or agent of the person paying such charge." I hold that the record establishes that Adolco Trading Co. was the owner and importer of the merchandise, and had standing to file a protest as to entry No. 517254, over which this court has jurisdiction. *United States* v. *Hannevig*, 10 Ct. Cust. Appls. 124, T.D. 38384 (1920) ; *United States* v. *Waterbury Lock & Specialty Co.*, 35 CCPA 131, C.A.D. 384 (1948) ; *Great Lakes Foundry Sand Co.* v. *United States*, 15 Cust. Ct. 256, Abstract 50442 (1945), *appeal dismissed* 33 CCPA 190 (1945) ; *Air Carrier Supply Corporation et al.* v. *United States*, 35 Cust. Ct. 173, C.D. 1740 (1955), *aff'd*, 44 CCPA 116, C.A.D. 647 (1957).

After examining the record and considering the arguments of counsel, plaintiffs' exhibit 5 for identification and defendant's exhibit F for identification are deemed in evidence, and defendant's motion to exclude exhibits 2F, 2H, 2L, 2M, 2N, and 2Q, which were received in evidence at the trial, is denied.

The principal issues in the case are whether the imported articles were properly classified as luggage, and if not, whether they are classifiable as claimed by plaintiffs, as articles of plastics, not specially

provided for, or as alternatively claimed by defendant, as handbags. A separate issue exists as to Court No. 69/8845 where defendant claims the merchandise is not of plastics and is classifiable as articles of textile materials.

At the trial there was received in evidence a document which lists the protests herein, together with a reference number or description of the merchandise involved in each, and an indication as to which merchandise is represented by a sample. (Exhibit 1.) Mr. Cohn testified that he had furnished plaintiffs' counsel with samples and had marked each of them so that they would correspond with the style number, carton number or the description in exhibit 1. These samples were offered and received in evidence as collective exhibit 2A through 2S.

The articles consist of plastic bags in various sizes, the smaller bags being about 9 by 9 by 4 inches and the larger ones 13 by 14 by 4 inches, more or less. They all have wide openings and large looped handles attached by rivets. Many have flat bottoms the same size as the openings. Some of the bottoms are reinforced with cardboard. Some have gussets on the sides. A few are lined. Some simulate fabrics of leather, two simulate alligator, and one a knobby material. Others have pictures or designs thereon, such as flowers or stripes. Exhibit 2K is decorated with raised flowers and has a pocket for an umbrella. Exhibit 2F has a zippered pocket. Exhibit 2C is a net string bag.

Mr. Cohn testified that exhibits 2A through 2S were shopping bags, and that the articles listed on exhibit 1 which were not represented by samples were shopping bags which were in no way unusual. He said he had sold shopping bags for 25 years, had been importing them for 15, and prior to that had manufactured them. He bought and sold the instant merchandise as shopping bags and had seen women buy them for the purpose of shopping, that is, to take to a store to put parcels in. His customers—department stores, variety stores, and local stores— sell them as shopping bags. He has seen them advertised and displayed in stores as shopping bags. He did not sell his products to luggage stores and did not know of any luggage that sells for 39 or 49 cents, whereas retailers sold none of his shopping bags at such prices.

Mr. Cohn stated that when he manufactured shopping bags, they were primarily made of cotton because he did not know the process of applying a strong handle to a plastic. About 10 years ago he imported a paper shopping bag covered with vinyl plastic, the pioneer of the vinyl shopping bag. (Ehibit 4.) The vinyl material was used to ensure durability. He said. however, that both the vinyl-covered paper bag and a plastic bag, such as exhibit 2D, would tear if too much weight were put in.

Frank Ingber, an independent salesman representing importers and manufacturers, including Adolco Trading Co., testified that from 1937 to 1949 he had worked for Acorn Paper Co. selling paper shopping bags to the grocery and supermarket trade. The witness identified a collection of paper bags (collective exhibit 5) as shopping bags. The exhibit consists of a large number of paper bags of various dimensions. They have straight sides, a flat bottom, a wide opening, and two looped handles. Some are plain, some decorated, some have the name of a store printed thereon, some advertise a candidate for political office or a product. Mr. Ingber said they are usually given out by stores to hold purchases. He was not aware of any differences in use between paper and plastic shopping bags, except that the latter last longer. He had seen women carry groceries in both. At the time he sold paper shopping bags, they did not have vinyl bags, but now he is selling them to super-market chains, distributors, and notions jobbers, as shopping bags. He did not sell them to luggage stores or luggage departments because they would not handle "anything as low end" as shopping bags.

Howard Bieber, director of sales of Prepac, Incorporated, a manu-facturer and importer of vinyl products, testified that his firm sells shopping bags and luggage. He referred to articles like those in ex-hibit 2 as shopping bags and considered them "impulse items," that is, merchandise of low price that a customer does not think too much about before buying. He has heard them referred to as shopping bags at retail outlets, discount centers, and supermarkets, and by distribu-tors. He defined a shopping bag as a carry bag used to carry small ob-jects and packages home from the store.

He identified a group of bags which Prepac imports (collective ex-hibit 6) and said they were shopping bags similar to those in exhibit 2. He had seen them displayed in supermarkets, drug chains, and dis-count centers on a rack or table. At times there were notations "shop-ping bags" and at times not. He described exhibits 7, 8, and 9 as ad-vertisements and photographs showing the way such merchandise was sold. In all of these the term "shopping bag" appears. He had also seen advertisements calling such articles totes or tote bags.

The witness said his firm's shopping bags are sold to the consumer at prices ranging from $0.35 to $1.49 and that the instant merchandise is sold in the same price range. It cannot usually be sold to or in lug-gage stores or departments because it is too cheap an item.

According to Mr. Bieber, the term "tote" is a general one used to in-dicate all types of carry bags, regardless of whether they are used for shopping or travel. There are totes which are not shopping bags. In fact, his firm sells an article called a travel tote, which is made of heavier vinyl than shopping bags. (Exhibit 10.) It has inside and

outside pockets; the handles are different; it has a different shape, can hold heavier objects, is more durable and has a closure which can be locked.

Mr. Cohn said a tote bag is made of a different material, such as leatherette, and is not an "outspoken shopping bag." Mr. Ingber said the word "tote" is a general term used by many manufacturers to refer to carry bags. A school bag or a duffle bag may be referred to as a tote bag. He said defendant's exhibit B depicted three bags with handles which could be tote bags and looked like something his wife would use as a handbag.

Mr. Cohn was aware that people used his merchandise for purposes other than shopping, such as to carry lunch or take to the beach. He said his products were waterproof, multipurpose bags, but that he imports and sells them as shopping bags. He also sells a bag which is more appropriate for use at the beach because it has a string which can be drawn to close the bag and prevent sand from getting in. (Exhibit 3.)

Mr. Bieber had traveled in many areas of the United States and had seen articles like exhibit 2 used for shopping and for other purposes, but primarily for shopping. He did not believe they had lost their identity as shopping bags by the other uses, because they are basically used for shopping. He said they were not used for travel for the same purposes as luggage, which in his view included suitcases, suit bags, dress bags, and travel bags.

In the opinion of Mr. Ingber, the articles herein are not travel bags and would not be used to carry clothing. Defendant's witness Archie Gellis considered them to be in the tote bag field, not luggage, such as men's suit bags, 24-inch carry-ons, and traveling bags. He did not think they could be used for traveling.

Barry Bienen, customs inspector at Kennedy Airport, testified that passengers bring in their belongings in all types of articles, including expensive and popular brands of luggage, knapsacks, duffle bags, specialized containers, and items such as those in exhibit 2. They use the latter to supplement their other luggage, and, in rare instances, as their only luggage. People carry personal effects in such bags, and also books, magazines, sweaters, foodstuffs, and purchased articles. The witness and his wife used bags such as exhibit 2G to carry the dog's paraphernalia when they travel.

Stephen Wolf, another customs inspector, had seen two women carrying bags, such as exhibit 2, that morning, to hold lunches, sweaters, and newspapers. He did not know whether they were going shopping.

John F. Casey, a special agent in the Customs Bureau, testified that in June 1973 he went to the Cross County Shopping Center in West-

chester County and observed that Gimbel's had no display of any tote bags; that such articles were in an enclosed shelf below the regular merchandise, and that no paper shopping bags were around. In Wanamaker's he found shopping bags, such as the instant merchandise, being sold in the luggage area. He purchased a bag tagged "Utility Bag — Ideal for shopping, travel, sewing & knitting, books, extra pair of shoes, cosmetics, etc." for $2. (Exhibit G.)

The witness also visited Woolworth's and found bags like those in exhibit 2 on a shelf with canvas bags, leather bags, and pocketbooks. He found similar merchandise in Uttal's Luggage Store. The day before the trial he saw shopping bags being sold in Reade's Drugstore on Broadway under a sign "tote-alls" for shopping, travel, beach, shoes. He purchased one for 79 cents. (Exhibit F.)

He had seen only one bag like exhibit 2 being carried in the shopping center. He had seen others at Belmont Racetrack, Rye Beach, and Jones Beach, used to carry rain gear, compact umbrellas, newspapers, racing forms, crocheting and sewing equipment, beachwear, towels, and foodstuffs. He saw one for sale as a tote bag for $1.

Since the merchandise was assessed with duty as luggage by customs officials, plaintiffs have the burden of overcoming the presumption of correctness attaching to that action and of establishing the claimed classification as correct. *United States* v. *Victoria Gin Co., Inc., et al.*, 48 CCPA 33, C.A.D. 759 (1960) ; *Hayes-Sammons Chemical Co.* v. *United States*, 55 CCPA 69, C.A.D. 935 (1968) ; *Nomura (America) Corp.* v. *United States*, 58 CCPA 82, C.A.D. 1007, 435 F. 2d 1319 (1971).

The first question to be considered is whether the instant merchandise (except for that in Count No. 69/8845) was properly classified as luggage.

For the purpose of the tariff schedules, luggage has been defined in schedule 7, part 1D, headnote 2(a), *supra,* to cover

(i) travel goods, such as trunks, hand trunks, lockers, valises, satchels, suitcases, wardrobe cases, overnight bags, pullman bags, gladstone bags, traveling bags, knapsacks, kitbags, haversacks, duffle bags, and like articles designed to contain clothing or other personal effects during travel, and

(ii) brief cases, portfolios, school bags, photographic equipment bags, golf bags, camera cases, binocular cases, gun cases, occupational luggage cases (physicians', sample, etc.), and like containers and cases designed to be carried with the person, except handbags as defined herein.

The bags involved herein are not among the named articles in either subsection. The question thus is whether they are "like articles designed to contain clothing or other personal effects during travel" or "like

containers and cases designed to be carried with the person, except handbags."

The exemplars in subsection (i) are all articles customarily used for travel, which can be closed and usually locked. The bags before the court cannot be locked or even closed securely. They could not be handled as checked baggage on trains, buses or airplanes, because the articles in them would fall out when given normal baggage handling. For the same reason, they could not be placed in overhead racks or airplane lockers. Moreover, people do not ordinarily carry personal clothing in open bags where it can become soiled or is in danger of falling out. The instant bags are not designed or suitable for carrying clothing or personal effects during travel, and according to the evidence presented, are rarely so used. They may be used to supplement luggage or to carry purchases made on a trip. They are not sold in stores which handle luggage and are much cheaper articles than those sold as luggage. Several witnesses said they could not be used for travel in the same way as luggage.

The exemplars in subsection (ii) are containers or cases which are designed to hold specific items which give them their names: brief cases to hold papers, school bags to hold school articles, golf bags to hold golf equipment, gun cases to hold guns, camera cases to hold cameras, etc. The imported articles are not of this type. They are, of course, containers designed to be carried with the person, but they are not "like" the containers or cases enumerated. The provision does not embrace all containers and cases designed to be carried with the person, but only those *ejusdem generis* with those enumerated. *Cf. Joanna Western Mills Company* v. *United States (Unitron Import Corp., Party in Interest)*, 64 Cust. Ct. 218, C.D. 2983, 311 F. Supp. 1328 (1970), and *Venaire Shade Corp.* v. *United States*, 66 Cust. Ct. 469, C.D. 4235 (1971), construing the term "like furnishings" as those having a common purpose and function with the enumerated furnishings.

In the instant case, the imported bags are not cases or containers for specific articles or equipment. They are flexible bags with wide openings so that various articles of different sizes and shapes can be put therein and carried. They are bought, sold, and commonly called shopping bags. They are designed primarily for use while shopping, to take articles home from the store. They are used for that purpose and also for convenience in carrying various (but not specific) articles. They have a different function from the enumerated examples and are not "like" them.

Defendant argues that because subsection (ii) provides for "like containers and cases designed to be carried with the person, *except handbags as defined herein*," Congress did not intend to limit cover-

age to any specific type of container or case. The exception, however, does not obviate the requirement that the containers be "like" those mentioned. Had Congress intended the broad coverage proposed by defendant, it would have provided for "*all* containers and cases designed to be carried with the person, except handbags."

I conclude that articles of the kind involved herein are neither travel goods nor cases and containers like portfolios, school bags, camera cases, etc. They are not luggage, as defined by the tariff schedules, and are not properly classifiable as such. The fact that some of the involved bags have added features, such as a zippered pocket or an umbrella pocket, is not sufficient to put them into the classification luggage. Whether or not other added features or changes or the use of other material might do so is not before the court at this time. In view of the large number of samples and the testimony of Mr. Cohn that the articles not represented by samples were shopping bags in no way unusual, I find that the articles unrepresented by samples may properly be treated in the same manner as those that were.

Defendant claims that if the merchandise is not classifiable as luggage, it is dutiable under item 706.60, as handbags. The term "handbags" is defined in schedule 7, part 1D, headnote 2(b), to cover

> pocketbooks, purses, shoulder bags, clutch bags, and all similar articles, by whatever name known, customarily carried by women or girls, but not including luggage or flat goods as defined herein or shopping bags.

Defendant claims that the instant articles do not fall within the exception on the ground that they are not shopping bags but are tote bags and that tote bags are women's handbags, citing dictionary definitions of the term "tote bag." The evidence establishes, however, that the articles are bought, sold, and commonly called shopping bags and that the term tote or tote bag is used in the trade to cover various types of carry bags, including shopping bags, and bags which may be luggage (duffle bags, school bags or travel totes like exhibit 10) and others which may be handbags (exhibit B). Thus the fact that an article may be bought, sold or referred to as a tote or a tote bag does not establish that it is a handbag, as defined in the tariff schedules. Whatever may be the dictionary definitions, the specific definition in the tariff schedules is controlling for customs purposes. That requires that a handbag be one of the exemplars or a similar article.

The articles listed, pocketbooks, purses, shoulder bags, clutch bags, are used to carry money, licenses, credit cards, cosmetics and other personal items. They have a closure, and sometimes several of them, to prevent valuables and small articles from falling out or being stolen. Shopping bags on the other hand, have no closure but have wide open-

ings to facilitate the insertion of variously shaped packages. Even without the specific exception for shopping bags in the definition, articles like those involved herein could not be regarded as similar to the exemplars and classifiable as handbags. Congress clearly did not intend them to be so classed.

Since these articles are of plastics, and there is no tariff provision for shopping bags, or for bags generally, they are classifiable as claimed under item 774.60, *supra*, as articles, not specially provided for, of plastics.

In Court No. 69/8845 the complaint alleges that the merchandise consists of shopping bags "of plastics" and claims that it is classifiable under item 774.60, *supra*, as articles of plastics. Defendant's original answer denied that the articles were shopping bags and averred that they were classified as luggage of plastics. At the trial a sample of the merchandise was received in evidence as exhibit 2C. It is a net string bag in a small plastic pouch. Double strands are joined together in such a way as to form a mesh bag. The strands are braided to form the handles and clips are attached.

Defendant was granted leave to file an amended answer. In that document, filed subsequent to the trial, it is denied that the merchandise is "of plastics," and averred that it is "of textile materials." It is claimed that the merchandise consists of textile net articles classifiable under item 386.08, *supra*, and it is requested that the merchandise be held so classifiable or that plaintiffs' claim for classification under item 774.60 be overruled and the customs classification affirmed. No reply was made to the amended answer.

Under *R. H. Macy & Co., Inc.* v. *United States*, 57 CCPA 115, C.A.D. 988, 428 F. 2d 856 (1970), and *United Merchants, Inc.* v. *United States*, 60 CCPA 11, C.A.D. 1073, 468 F. 2d 208 (1972), it was held that the provision in item 772.35 for curtains and drapes of rubber or plastics, covered such articles only when the plastic material was in sheet form, but not when the material was woven from a polyester yarn spun from man-made fibers. The court in the *Macy* case said (p. 118):

> The court below concluded from this passage that there was a distinction to be drawn between products of man-made fibers, which were to be classified under the textile schedule *even if* the fibers were of rubber or plastic, and "other articles of rubber or plastics," which would be classified under part 12 of schedule 7. The court concluded:
>
> > We are inclined to the view that the term "plastic" as employed in part 12 of schedule 7 describes a form as well as a substance, and does not cover plastic materials which have been converted into textile materials.
> >
> > A yarn which was produced from a basic plastic substance has by that process of manufacture taken on the status of a

textile material from which a textile product will be produced, and for tariff purposes may no longer be considered a "plastic" but rather a man-made fiber.

In view of these decisions, it is evident that the merchandise represented by exhibit 2C is not classifiable under schedule 7, part 12, since it is in the form of a product made from textile materials. For this reason, plaintiffs' claim that this merchandise is classifiable under item 774.60, *supra*, as articles of plastics, not specially provided for, cannot be sustained.

For the reasons stated, judgment will be entered severing entry No. 235923 from Court No. 70/65713; denying defendant's motion to exclude exhibits 2F, 2H, 2L, 2M, 2N, and 2Q; dismissing Court Nos. 69/8845, 68/65804, 69/7629, 69/50143, 69/50144, and 70/20678, and Court No. 69/51817 as to Carton No. 366, Court No. 69/52229 as to Style No. A 618, Court No. 70/43187 as to Carton Nos. 49/109, Court No. 70/49107 as to Carton No. 1198, and Court No. 70/60821 as to Style No. 1095; and sustaining the claim as to all other merchandise, which is held properly dutiable under item 774.60, Tariff Schedules of the United States, as modified by Presidential Proclamation No. 3822, T.D. 68–9, as articles, not specially provided for, of plastics, at the rate of duty in effect on the respective dates of entry of the merchandise.