## ERHARDT *v.* SCHROEDER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 31. Argued January 24, 25, 1894. — Decided November 12, 1894.

It is a general rule that provisions in statutes imposing taxation, though not in terms mandatory, are to be regarded as such if necessary for the substantial protection of the taxpayer.

The customs laws, however, give to the complaining importer an ample remedy, only putting him to the inconvenience of seeking it in a legal tribunal.

In an action to recover duties alleged to have been illegally exacted, the burden is on the importer to overcome the presumption of a legal collection by proof that their exaction was unlawful.

Although the appraisement of goods by customs officers is not ordinarily open to judicial review, that rule does not apply when the value is determined by a classification made by the officer.

The provision in Schedule F, of the act of March 3, 1883, c. 121, 22 Stat. 488, 503, imposing a duty upon leaf tobacco, evidently requires that 85 per cent of half leaves are to be of the requisite size and necessary fineness of texture for wrappers, or, in other words, that each of 85 half

leaves out of 100 half leaves must contain a portion sufficiently fine in texture, of the requisite size to make at least one wrapper.

The further provision in that schedule, " of which more than 100 leaves are required to weigh a pound," refers to whole leaves, in their natural state.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Whitney* for plaintiff in error.

*Mr. Edwin B. Smith,* (with whom was *Mr. William B. Hill* on the brief,) for defendants in error.

MR. JUSTICE SHIRAS delivered the opinion of the court.

The defendants in error commenced this action in the Superior Court of the city of New York on May 6, 1889, against Joel B. Erhardt, collector of the port of New York, to recover the sum of $32,040.60, which amount they alleged had been unlawfully exacted from them by that officer as customs duties on leaf tobacco. The case was removed by *certiorari* into the Circuit Court of the United States for the Southern District of New York, in which court the complaint was filed, and the case proceeded to trial before the court and a jury.

As appears by the bill of exceptions, the defendants in error, partners as Schroeder & Bon, on November 5, 1888, imported from Amsterdam and entered at the port of New York, for warehouse, 429 bales of leaf tobacco, described in the invoice as Sumatra tobacco. The protest filed in this case related to 398 of those bales, but on the trial a recovery was abandoned of duties paid on such bales of the invoice as were withdrawn before May 6, 1889, for the reason that those duties had been paid to the predecessor in office of the defendant.

On that day, as the bill of exceptions further shows, the importers withdrew from warehouse five bales of the tobacco, upon one of which they paid duty at the rate of 75 cents a pound on 125 pounds of the tobacco in the bale, and 35 cents a pound upon 54 pounds thereof, and upon four of which bales they paid a duty of 75 cents a pound. On the following day

they withdrew five more bales, upon all of which they paid duty at the rate of 75 cents a pound.

The importers, contending that they should have been compelled to pay but 35 cents a pound on all of the ten bales, asserted that the amount constituting the difference between duties at that rate and at the rate of 75 cents a pound had been exacted from them unlawfully by Erhardt, and that amount, with interest, or $708.12, was sought on the trial to be recovered.

The evidence introduced by the importers showed that within ten days after the liquidation of their warehouse entry they had filed with the collector a protest against his decision, assessment, and liquidation of the duties; that within thirty days from the liquidation of the entry they had duly appealed to the Secretary of the Treasury, and that that officer having decided against them on appeal, they had within ninety days after his decision brought suit to recover the duties alleged to have been erroneously exacted.

It appeared from the invoice and the testimony of the examiner of tobacco at the appraisers' stores, called as a witness for the importers, that upon the entry of the tobacco the collector had designated five of the 429 bales for examination at the public stores; that subsequently, upon the request of the appraiser, twenty-five additional bales and no more had been sent to the public stores for examination; that of the plantation lots, about thirteen in number, of which the invoice was composed, four plantation lots, containing respectively ten, twenty-seven, twenty, and ten bales, were represented in the ten bales in controversy; two of these four lots being represented by four bales from each, and two of the four lots by one bale from each; that among the thirty bales sent to the public stores was one bale from each of the said four plantation lots; that one of the bales there examined was, and that the other three were not, among the ten bales in controversy; and that this one bale belonged to one of the plantation lots containing ten bales, and was the bale upon which the importer paid duty at the rate of 75 cents a pound upon 125 pounds thereof and 35 cents a pound upon 54 pounds thereof.

Other testimony was introduced to show the actual character of the tobacco.

On the trial, after all the testimony on both sides had been introduced, the collector moved the court to direct a verdict in his favor on the ground that the importers had not established facts sufficient to constitute a cause of action, which motion was denied. The collector excepted to this ruling, and asked to be allowed to go to the jury generally upon the issues of the case, and upon the court's refusal of this request the collector asked that the case might go to the jury upon the question whether there had been one package examined of the bales in controversy, claiming that although there was not one bale in ten of the entire invoice sent to the public stores, yet, as there were only ten bales in question, representing four plantation lots, and as four bales representing those ten bales had been actually examined at the public stores, there was a sufficient compliance with the statute. The court refused to submit this question to the jury, to which refusal the collector excepted. The importers then moved for the direction of a verdict in their favor, and the court granted the motion and directed a verdict for them for the sum of $708.12, to which action of the court the collector excepted. Judgment in favor of the importers, for the said amount, was duly entered on June 20, 1890, and subsequently the collector brought the case to this court by a writ of error.

The protest filed by the importers contained, among other things, an allegation that there had been no legal appraisal of the tobacco, for the reason that the provisions of section 2939 of the Revised Statutes had not been complied with. That section is as follows:

"The collector of the port of New York shall not, under any circumstances, direct to be sent for examination and appraisement less than one package of every invoice, and one package at least out of every ten packages of merchandise and a greater number should he, or the appraiser, or any assistant appraiser, deem it necessary. When the Secretary of the Treasury, however, from the character and description of the merchandise, may be of the opinion that the examina-

tion of a less proportion of packages will amply protect the revenue, he may, by special regulation, direct a less number of packages to be examined."

It seems, from the nature of a part of the evidence introduced on the trial, that the importers contended in the court below that the effect of the examination by the customs officers of less than one bale in ten of the invoice had the effect of invalidating the assessment of the higher tax upon the tobacco, provided for in paragraph 246 of the tariff act of 1883, and made it dutiable at the lower rate, as prescribed in paragraph 247 of that act.

The same ground of contention is presented in this court, the collector asserting that the provisions of Rev. Stat. § 2939 are in the nature of instructions to the officers of the customs, intended solely for the protection of the revenue, and, therefore, that no benefit from a violation of the statute could be taken by an importer. The importers insist, on the other hand, that inasmuch as the examination may have the effect of fixing a higher duty upon a given invoice of tobacco than that collectible upon leaf tobacco of the kind more extensively imported, the importer might be injured if the characteristics of the tobacco necessary to justify the exaction of the higher tax were determined by an examination different from that prescribed by § 2939, which enactment, therefore, they believe to be intended as well for the protection of the importer as the government, and hence mandatory. Collateral to the argument upon this point is the discussion by the parties as to whether the incident of the actual examination in this case of one of the ten bales in controversy, and the examination of one bale from each of four plantation lots represented by the ten bales, was equivalent to a substantial compliance with the statute.

Whether a statute is mandatory or directory is frequently a question of a great deal of importance to taxpayers, for the reason that errors in taxation are often susceptible of correction only by pointing to the non-observance of some law which, strictly followed by an officer, might have prevented the errors complained of. The acts of assessors, for instance,

in matters relating to general municipal and state taxation are, if legally performed, usually conclusive upon the taxpayer, unless some means of relief has been provided by the legislature, and often this relief is narrow. Very rarely, if ever, is there power in the judiciary to enter into all the questions affecting the legality of a charge for taxes, and therefore, in general, a statute, even though not in express terms mandatory, is treated as being so if its literal observance might afford substantial protection to the party complaining, and a failure of such observance by an officer is considered to render his act void. *French* v. *Edwards*, 13 Wall. 506, 511.

In the case of customs duties, however, a party dissatisfied with the classification of imports may apply to the courts to have examined and reviewed everything involving the legality of the demand which has been made upon him by a collector, and statutes containing directions to government officials, as to the manner in which they shall become informed of the dutiable character of merchandise, afford importers an altogether different kind of protection from that just mentioned. At most, a neglect of such provisions operates to no greater disadvantage to a party than to subject him to the necessity of bringing an action which he might not have felt impelled to bring if the tax had been ascertained in the manner prescribed. The unlawful demand of the duty does not conclude his rights, but, at the most, merely lays upon him, the inconvenience of going before a tribunal in which those rights will be declared.

An examination of one package in ten of the merchandise might have shown to the satisfaction of the collector that the importation was of the character the importer claimed it to be; the examination of one package in fourteen may have given the collector a different impression to the disadvantage of the importer. But the proceedings do not necessarily end with the collector's decision, and the importer's rights are not finally fixed until the character of the goods has been found by a court.

The protection of the convenience only of a taxpayer is not of such a vital nature as to authorize a court to treat a statute

primarily directed to public officers for their guidance, and the substantial protection of the government, as mandatory, and to consider official acts not in strict conformity with the statute as void. The protection must be substantial, and must be intended as a guard of rights or property. Cooley on Taxation, 215, 216.

In this view, it is apparent that the usual presumption of a legal collection is not changed by the circumstances of this case, and that the burden is upon the importer of overcoming this presumption by proof that the exaction of the duties was unlawful.

If the dutiable character of the goods in the present case were to be determined by *value*, the question of the effect of § 2939 might be of consequence to the importers, since in that event the value fixed by the appraisers, under section 2930 Rev. Stat., relating to appeals from appraisements, would be final, unless the appraisement were in some respect unlawful. The question of the value of the goods could not be raised in an action against the collector, and an attack upon the legality of the appraisement, for the purpose of having it declared illegal, and the goods therefore declared dutiable at the value stated in the invoice, would be the only means of redress by a court for an illegal exaction of duties based upon an erroneous valuation. The duty chargeable upon leaf tobacco was not fixed with reference to its *value*, but to certain prescribed characteristics of *size, fineness of texture, and weight*. It seems to have been the practice, under instructions issued by the Secretary of the Treasury, for the appraiser, in addition to ascertaining the value of goods, to ascertain the dutiable qualities of tobacco imported, and this act of the appraiser seems usually to be denominated an appraisement. At least, that word is so used by counsel on both sides of this case. Unless, however, this act of the appraiser is an *appraisement* in the sense of being an ascertainment of *value*, it would not be just to an importer to regard it as an appraisement in this kind of a case.

Section 3011 Rev. Stat. provided that any person who had made payment under protest, and in order to obtain possession

of merchandise imported for him, to any collector, or person acting as collector, of any money as duties, when such amount of duties was not, or was not wholly, authorized by law, might maintain an action in the nature of an action at law, which should be triable by jury to ascertain the validity of such demand and payment of duties, and to recover back any excess so paid. This statute is general in its terms, and is subject to but one qualification, namely, that in the action provided for no question can be raised as to the value of the merchandise, except to show that because of some illegality in the appraisement the value fixed by the appraiser should not be taken as the basis of the duties, but that the duties should therefore be fixed by the invoice.

In the case of *Hilton* v. *Merritt*, 110 U. S. 97, 106, Mr. Justice Woods said, in delivering the opinion of the court:

" Considering the acts of Congress as establishing a system, and giving force to all the sections, its plain and obvious meaning is that the *appraisement* of the customs officers. shall be final, but all other questions relative to the rate and amount of duties may, after the importer has taken the prescribed steps, be reviewed in an action at law to recover duties unlawfully exacted. Questions frequently arise whether an enumerated article belongs to one section or another. . . . In determining the rate and amount of duties the value of the merchandise is one factor, the question what schedule it properly falls under is another. . . . Questions relating to the classification of imports and consequently to the rate and amount of duty are open to review in an action at law."

A common instance of the recognition of the right of a party to review, in an action at law, a question of the classification of imports is to be found in cases where there is no dispute as to the character of the merchandise, but the contest is upon the name properly applicable to it, in the meaning of a statute. Many such cases are cited in *Cadwalader* v. *Zeh*, 151 U. S. 171, 176, which case is itself a similar instance. In such controversies the question to be answered is what the article is. The question is the same where there is no dispute over terms, but as to the qualities or characteristics necessary

to bring the article within the statutory description. In either case the matter to be decided is the portion of the act under which the article properly falls, and in all cases, eliminating only the question of the value of the merchandise, the classification may be reviewed in an action at law.

We are thus brought to the question of the actual character of the tobacco, with reference to the paragraph under which it was properly dutiable. This question is raised by the following allegation of the protest: " We protest against the estimate of quality of the different grades of said tobacco as made by the appraiser, and the assessment of 75 cents per pound as made by you as unlawful and as not in accordance with the provisions of Schedule F of the act of March 3, 1883, c. 121, 22 Stat. 488, 503, claiming said tobacco to be dutiable under said provision at only 35 cents per pound because eighty-five per cent of said tobacco is not of the requisite size and of the necessary fineness to be suitable for wrappers, and less than one hundred leaves are required to weigh a pound."

The provisions of Schedule F of the tariff act of 1883, under which the duties in this case were exacted, were as follows:

" [246.] Leaf tobacco of which eighty-five per cent is of the requisite size and of the necessary fineness of texture to be suitable for wrappers, and of which more than one hundred leaves are required to weigh a pound, if not stemmed, seventy-five cents per pound; if stemmed, one dollar per pound.

" [247.] All other tobacco in leaf, unmanufactured and not stemmed, thirty-five cents per pound."

Diverse views were entertained by the parties concerning the meaning of paragraph [246], the most important of which had reference to the question whether the bale was to be treated as the unit to which the percentage test was to be applied, or whether the characteristics of the tobacco were to be ascertained by examining a number of representative hands, (which are small bundles of leaves fastened together,) and if certain of the examined hands should be found to be dutiable at one rate and the others at a different, the bale should be assumed to contain tobacco of two different grades, and the duties laid accordingly.

The proper answer to this question seems to depend upon the particular circumstances of a given case. It appears in the testimony on both sides of this case that leaf tobacco is divided into two classes, known as the wrapper class and the filler class. Whether or not a bale of tobacco is of uniform character seems to be easily ascertained. A dealer in leaf tobacco, one of the witnesses for the collector, said: "We never draw [from a bale] less than four hands, and it may run four hands, six hands, eight hands, or ten hands, according as we may find whether the bale has been packed honestly, as we term it, or whether it has been packed mixed. If the first four hands drawn should be entirely uniform, we probably would not draw any more, and in any event we would be hardly likely to draw more than ten hands."

If, then, a bale, or other separate and concrete quantity of leaf tobacco, contained only leaves of such uniformity of character as to be, in their collective form, of one class, the bale, or other separate collection, would be the unit contemplated in the percentage and weight tests of paragraph [246]. On the other hand, if the bale contained tobacco of two classes, the unit would be the ascertained quantity of either class. The leaf tobacco meant by paragraph [246] is, apparently, a collection of leaves, or half-leaves, having the similarity caused by the circumstances of their having grown in soil of the same general character, in the same climate, and under the same general conditions of moisture or dryness, and by such selection or assortment as it may be customary to make on the plantation; yet having the differences which, despite the similarity of habitat and environment, are to be found in all natural products. Congress is, of course, presumed to be familiar with the fact that leaf tobacco is divided into classes, or is subjected, before being placed in bales, to some kind of an assortment, and a knowledge of the similarities and differences which are to be found in a collection of leaves of a class doubtless furnished the reason for the adoption of the percentage test.

All the tobacco in question in this case, as the evidence on both sides shows, was raised in the same country, and was all

of the class known to the trade as wrappers.   Therefore, any
bales, or, indeed, the whole invoice, if it might conveniently
be treated as a whole for the purpose, was just such a unit as
was intended by the statute.   Any other view of this legisla-
tion would make it meaningless, for the very term, " per cent,"
implies an understanding that the tobacco to be taxed, even
though of an uniform grade, may contain some leaves posses-
sing and some not possessing the qualifications required for
the higher tax.   In such a case, if separate hands, taken from
a bale containing only leaves of one class, were treated as
units, the result might be an inaccurate conclusion.   Doubtless
in the hands classed as containing tobacco dutiable at the lower
rate there would be leaves having all the requisites of the
higher grade, while in the hands ascertained to be taxable at
the higher rate would be leaves of the lower grade.   This
might have the effect of making a division of tobacco of one
commercial class into two grades with respect to taxation — a
division which we do not believe to have been contemplated
by the statute.   If the character of the tobacco is to be learned
from an examination of a representative quantity therefrom,
such as ten hands, the hands should be separated and the
statutory tests applied to the general collection of all the
representative leaves, irrespective of their casual association
in the separate hands.

Examining the evidence in this case, we find that one of the
importers gave testimony, based upon an examination of
samples from the bales in controversy, tending to show that
two of the plantation lots which were represented by five of
those bales contained tobacco of which 85 per cent neither
of the surface of the leaves nor of the quantity thereof, as
estimated by the weight of the bale, was of the requisite size
for wrappers ; that the other two lots, represented by the
other five bales in controversy, contained tobacco of which
85 per cent of the surface, but not 85 per cent of the weight,
was suitable for wrappers.   He further testified that 85 per
cent of the tobacco was suitable for wrappers in respect to
fineness of texture.

Considered with regard to fitness for wrappers each leaf of

tobacco is divided, by what is called the stem, into two distinct portions. It is matter of common knowledge, that, in making wrappers, the stem is not used, but is removed, with the result of dividing the leaf into separate pieces. From these pieces only are wrappers made, and their size and fineness of texture determine their suitability for wrappers, for if one piece is of insufficient size it cannot be aided in usefulness as a wrapper by the portion on the other side of the stem. If tobacco is imported with the stems removed, each piece or side, as it appears to be called by dealers and manufacturers, would of necessity be treated as independent, for there would be no means of knowing with certainty what parts were originally together in one leaf. In applying the test of size, therefore, the size of either side of the leaf is to be looked to, and the evident requirement of the statute is that eighty-five per cent of half-leaves, or eighty-five out of a hundred, are to be of the requisite size and necessary fineness of texture for wrappers. In other words, each of eighty-five half-leaves out of a hundred half-leaves must contain a portion, sufficiently fine in texture, of the requisite size to make at least one wrapper. Eighty-five per cent of the surface of the single leaf is not intended, for in that view any single leaf large enough for a wrapper would be, in respect to *size*, one hundred per cent or entirely of the requisite size for wrapper purposes, or, if one wrapper could not be made from it, the leaf would have, as to size, no percentage of suitability. Hence any leaf would be required to be treated simply as fit or unfit, one hundred per cent suitable in size or not suitable at all, and no general percentage test would be applicable.

The *importers call attention to their testimony to the effect* that in none of the four lots mentioned by them was there eighty-five per cent of the weight of the tobacco suitable for wrappers, and suggest that "as the commodity was bought, sold, and dutied by the pound, the weight must be the test to which the percentage rule applies." There is a practical objection to this view, however, which renders it not acceptable. It might often happen that a half-leaf which was suitable, according to the required test, would be joined, in

an unstemmed leaf, to one which was unsuitable, in which case the weight of the respective parts could not be ascertained. The most natural interpretation of the paragraph in question is to consider eighty-five per cent of half-leaves, or suitable half-leaves eighty-five in number out of half-leaves one hundred in number as the requirement, and to regard the proportion of the weight of the suitable half-leaves to the weight of all the leaves as immaterial.

A further requirement of the act is that the leaves of the collection must be of such average lightness that more than one hundred are required to weigh a pound; that is to say, if the collection should weigh 160 pounds it must contain more than 16,000 leaves; or if some smaller collection, taken as representative of the whole, such as ten hands, should weigh four pounds, this representative collection must contain more than 400 leaves. Here we are not to have in view, as in the other test, the separate parts of the leaves, for the language of the act expressly provides for the condition that "100 leaves are required to weigh a pound." The word *leaves* plainly means leaves in their natural state, or whole leaves.

Assuming that the importers, in testifying concerning the size and fineness of texture of tobacco, had in mind the proper test when speaking of the percentage of the surface suitable for wrappers, we must take their evidence to mean that only five of the ten bales in controversy contained tobacco of which less than eighty-five per cent fulfilled, as to the size and fineness of texture, the demands of paragraph 246. It would seem, therefore, that the court below was in error in directing a verdict for the importers, and that the judgment of that court ought to be reversed, and the case remanded with directions to set aside the verdict, and to order a new trial, in order that a jury may pass upon the real character of the tobacco contained in the ten bales withdrawn by the importers.

*Judgment reversed.*

MR. JUSTICE BREWER did not sit at the argument or take part in the decision.