**EXXON CHEMICAL PATENTS, INC.,**
Plaintiff–Appellee,

v.

The **LUBRIZOL CORPORATION,**
Defendant–Appellant.

Nos. 90–1255, 90–1313.

United States Court of Appeals,
Federal Circuit.

June 4, 1991.

William C. Slusser, Baker & Botts, Houston, Tex., argued for plaintiff-appellee. With him on the brief was Lee L. Kaplan. Lawrence F. Scinto, Fitzpatrick, Cella, Harper & Scinto, New York City, argued for plaintiff-appellee. With him on the brief was Nels T. Lippert. Also on the brief was Kenneth M. Bialo, New York City.

Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Cleveland, Ohio, argued for defendant-appellant. With him on the brief were Regan J. Fay, Robert J. Hoerner, James L. Wamsley, III and Hal D. Cooper, of counsel.

Before NEWMAN, MICHEL, and PLAGER, Circuit Judges.

PER CURIAM.

On this appeal of various district court orders granting and refusing to vacate an injunction,[1] The Lubrizol Corporation raises the question of whether the United States patent in suit was validly issued on the issue date reported in the *Official Gazette* of the Patent and Trademark Office when on that date, and for a substantial period thereafter, the patent document was not printed, the patent grant was not signed by or on behalf of the Commissioner, the official seal was not affixed, a copy of the specification and claims was not available to the public, and access to the prosecution history was denied. Under these circumstances, Lubrizol asserts, the district court lacked subject matter jurisdiction as there was no valid patent and therefore the injunction can not stand. Because as a matter of law jurisdiction is established by the complaint which pleads a valid patent, we affirm.

1. *Exxon Chemical Patents, Inc. v. Lubrizol Corp.,* No. CA–H–89–3203 (S.D. Texas Nov. 21, 1989) (Order); *id.,* (S.D. Texas March 8, 1990) (Order).

## Background

The September 19, 1989 issue of the *Official Gazette* listed, among patents issued that day, Patent No. 4,867,890 ("the '890 patent"). The *Official Gazette* entry stated the title "Lubricating Oil Compositions Containing Ashless Dispersant, Zinc Dihydrocarbyldithiophosphate, Metal Detergent and a Copper Compound", gave the names and addresses of the inventors, listed the filing and priority dates, printed the text of patent Claim 1, and stated that there were 32 claims. The same day, September 19, 1989, Exxon Chemical Patents ("Exxon") filed suit against The Lubrizol Corporation ("Lubrizol") in the United States District Court for the Southern District of Texas, Houston Division, charging Lubrizol with infringement of the '890 patent.

On October 4, 1989 Lubrizol filed a declaratory judgment action against Exxon in the United States District Court for the Northern District of Ohio, requesting that the '890 patent be declared invalid, unenforceable, and not infringed. On October 13, 1989 Lubrizol filed a motion in the Texas court to stay or transfer the suit filed by Exxon, on the basis that Ohio was a more suitable forum than Texas. Personal jurisdiction in the Texas court was not contested by Lubrizol.

Meanwhile, despite frequent requests (twice a day, according to Lubrizol), the PTO was unable to provide a copy of the '890 patent. On October 19, 1989, one month after the *Official Gazette* date, a print marked "Department Proof" was provided by the PTO.[2] On October 23, 1989 Lubrizol moved the Texas court to dismiss the Exxon suit for lack of subject matter jurisdiction, on the basis that the '890 patent had not issued when Exxon filed suit on September 19, 1989, and still had not issued. With its motion papers Lubrizol submitted the affidavit of a former Commissioner of Patents and Trademarks, who described delays that occurred from time to time in the printing of patents after their listing in the *Official Gazette*.

Another affiant on behalf of Lubrizol averred that on requesting the application file for the '890 patent during the first week of October, 1989, he was told that the file was "not available". Although the PTO wrote to Exxon's counsel on November 8, 1989 that the '890 patent file was available as of September 19, 1989 in the Office of Publications, it was undisputed that this arrangement was irregular, see Manual of Patent Examining Procedure § 1309 (1990), and was not communicated to Lubrizol's agent in response to his inquiries.

On November 1, 1989 the PTO affixed, to a copy of the printed patent, a printed cover sheet with the text, *inter alia*, that "it has been determined that a patent on this invention shall be granted under the law" and "[g]rants ... the right to exclude ... for the term of seventeen years from the date of this patent". The cover sheet bears the seal of the PTO, and the facsimile signature of Donald J. Quigg in the space designated for signature by the Commissioner of Patents and Trademarks. Below the facsimile signature, in the space designated "Attest", is the signature of Melvinia Gary, not identified by title. The printed patent bears the words "Date of Patent: Sep. 19, 1989". The PTO stated, in a November 15, 1989 letter to Lubrizol, that this document was mailed on November 1, 1989.

On November 6 Exxon moved the Texas court to enjoin Lubrizol's Ohio suit. On November 15 Exxon filed a First Amended Complaint in the Texas suit. The First Amended Complaint quoted the November 15 letter which stated

> the Seal of the Patent and Trademark Office and the attesting signature were placed on the grant on November 1, 1989.

and that

> the records of the Patent and Trademark Office indicate that [the '890 patent] is-

**2.** Lubrizol received a copy of the Department Proof from Exxon on October 20, 1989. Lubrizol later obtained documents through the Freedom of Information Act showing that certain

errors in the Department Proof were corrected on October 30. The FOIA documents show special efforts by the PTO during this period to expedite the processing of the '890 patent.

sued on September 19, 1989. The records referred to are the PTO's PALM data base and the Patent File.

The several motions were heard by the Texas court on November 16, 1989. In colloquy with the court Lubrizol agreed that any flaw in jurisdiction was cured on November 1, but argued that Exxon's First Amended Complaint could not relate back to the time the original complaint was filed and did not cure the jurisdictional defect of the original complaint. Lubrizol also continued to press the argument that Ohio was the preferable venue.

Following the hearing the Texas judge telephoned the Ohio judge; the records of both courts show their agreement on the management of this litigation. In harmony with this agreement, on November 21, 1989 the Texas court denied Lubrizol's motion to dismiss for lack of subject matter jurisdiction, enjoined Lubrizol from litigating the same issues concurrently in any other court, adopted the discovery schedule that had been set by the Ohio court, provided for further discovery under the supervision of the Texas court, and postponed decision of the transfer request. *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, Civil Action No. H–89–3203 (S.D. Texas November 21, 1989) (Order). Upon denial of its motion to vacate or alter or amend that judgment Lubrizol appealed, basing appellate jurisdiction on the district court's injunction against prosecution of the Ohio suit.

It was soon recognized that although Commissioner Quigg's facsimile signature was affixed and attested on November 1, 1989, he had resigned as Commissioner effective October 31, 1989. Based on this new asserted defect Lubrizol filed renewed motions to dismiss or transfer, again asserting lack of jurisdiction and improper venue.

At Exxon's request, on January 26, 1990 Acting Commissioner Samuels personally countersigned the cover sheet of the patent grant, after which Exxon moved to file a Supplemental and/or Amended Complaint stating this event. On March 8, 1990 the district court granted Exxon's motion, denied Lubrizol's motions to vacate the injunction barring prosecution of the Ohio action and to dismiss the Texas action for lack of subject matter jurisdiction, and continued to hold "under advisement" Lubrizol's request to transfer the action to Ohio. *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, No. H–89–3203 (S.D. Texas March 8, 1990) (Order). Lubrizol also appeals these rulings.

## Discussion

 The district court's jurisdiction is governed by 28 U.S.C. § 1338(a), which grants the district courts original jurisdiction of any civil action "arising under any Act of Congress relating to patents". Section 1338(a) jurisdiction inures when a well-pleaded complaint establishes that

> federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 808–09, 108 S.Ct. 2166, 2173, 100 L.Ed.2d 811, 7 USPQ2d 1109, 1113 (1988). The proper focus is on whether the plaintiff actually pleaded the elements required by the patent laws for a patent infringement claim. *Kunkel v. Topmaster International, Inc.*, 906 F.2d 693, 695, 15 USPQ2d 1367, 1369 (Fed.Cir.1990). When a challenge to jurisdiction is in fact directed only to the merits of a question of patent law, it is proper for the district court to accept jurisdiction under § 1338(a). *See Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Thus the district court correctly assumed jurisdiction over the case.

We decide the interlocutory appeal before us by holding that the trial judge correctly assumed jurisdiction on the basis of the well-pleaded complaint. At this stage the question of validity (including the date of its validity) of the patent remains to be tried as a question of patent law.

Accordingly, the district court's orders, granting and refusing to vacate the injunction, are affirmed.[3]

*Costs*

Taxable costs in favor of Exxon.

AFFIRMED.

PAULINE NEWMAN, Circuit Judge, concurring in the judgment.

The issue appealed is the district court's grant of and refusal to dissolve an injunction against the prosecution of Lubrizol's declaratory action in Ohio or any other forum. Disposition of this issue requires more than deciding whether the complaint was "well pleaded" in terms of 28 U.S.C. § 1338(a).

The appeal of the grant and refusal to dissolve an injunction requires deciding whether the injunction was properly granted. Interlocutory orders granting and refusing to dissolve an injunction are appealable of right. 28 U.S.C. § 1292(a)(1) provides for the immediate appeal of "interlocutory orders ... granting, continuing ... or refusing to dissolve or modify injunctions".

Having been appealed, decision on the merits is required. The legal question of whether and when the '890 patent was issued is fundamental to this appeal. For if the '890 patent had not issued when Exxon filed its infringement suit, that suit does not enjoy the status of winner in the race to the courthouse, and the injunction against Lubrizol's action must be reviewed in that light. Whether the district court abused its discretion in enjoining Lubrizol's declaratory action thus requires that we determine, as a matter of law, whether the '890 patent properly issued, and if so, when.

For the following reasons, I have concluded that the '890 patent issued on the date of issue announced in the *Official Gazette.* Therefore I would affirm the Or-

ders of the district court granting and refusing to dissolve the injunction.

A

Underlying the issues raised by Lubrizol is the rule that an inventor has no enforceable rights under the patent laws until the patent securing those rights has issued. *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 195, 15 L.Ed. 595 (1857); *Tripp v. United States,* 406 F.2d 1066, 1071, 186 Ct.Cl. 872, 881, 157 USPQ 90, 93, 161 USPQ 115 (1969). That rule is not challenged by Exxon.

Lubrizol's position is that due to the PTO's delays and errors the '890 patent had not issued when Exxon's suit was filed on September 19, 1989, and that a complaint flawed by absence of jurisdiction cannot be cured by amendment based on events that occurred after the complaint was filed.[1]

Lubrizol asserts that the '890 patent did not issue on the day announced as the issue date in the *Official Gazette,* in view of the failure of the PTO to comply, on or before that date, with certain statutory provisions dealing with patent issuance. The statutes of primary concern are 35 U.S.C. §§ 153 and 154:

**35 U.S.C. § 153.** *How issued*

Patents shall be issued in the name of the United States of America, under the seal of the Patent and Trademark Office, and shall be signed by the Commissioner or have his signature placed thereon and attested by an officer of the Patent and Trademark Office designated by the Commissioner, and shall be recorded in the Patent and Trademark Office.

**35 U.S.C. § 154.** *Contents and term of patent*

Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout

---

**3.** The motions included in the briefs of the parties are denied.

**1.** In this concurring opinion I refer to the events set forth in the "background" section of the *per curiam* opinion, *ante.*

the United States, ... referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

The patent statute does not state when these steps should be taken. However, I believe that the only reasonable interpretation is that these steps were intended to be completed by the date of issuance of the patent.

The patent statute does not require that patents shall be printed, although printing is authorized in 35 U.S.C. § 11 and printed copies are referred to in several provisions of Title 35. The practice of printing patents to coincide with their date of issuance is long established, and indeed section 154 is implemented by annexing a copy of the printed specification to a cover sheet that bears the text of the official grant, the seal of the PTO, and the Commissioner's signature. In the case of the '890 patent the cover sheet, seal, and signature were tardily applied because the specification had not been printed.

Lubrizol asserts that the consequence of these events is that Exxon had no patent on which to sue, on the day it filed suit. Lubrizol cites *Marsh v. Nichols, Shepard & Co.*, 128 U.S. 605, 9 S.Ct. 168, 32 L.Ed. 538 (1888), as controlling law with respect to the effect on patent issuance of delay in execution of the grant.

*Marsh* was decided under the 1870 Patent Act. Revised Statutes § 4883, codifying § 21 of the 1870 Act, provided:

§ 4883. All patents shall be issued in the name of the United States of America, under the seal of the Patent–Office, and shall be signed by the Secretary of the Interior and countersigned by the Commissioner of Patents, and they shall be recorded, together with the specifications, in the Patent–Office, in books to be kept for that purpose.

In *Marsh* the Secretary of the Interior did not sign the patent grant, although the document was "countersigned" by the Commissioner. The absence of the signature of the Secretary of the Interior was not discovered until after the patentee filed suit for infringement. The Supreme Court, applying to execution of the patent grant the law governing execution of land patents (a land patent is a grant of real property from the nation), described the execution of land patents as follows:

Each and every one of the integral parts of the execution is essential to the perfection of the [land] patent. They are of equal importance under the law, and one cannot be dispensed with more than another. Neither is directory, but all are mandatory.

*Marsh*, 128 U.S. at 613, 9 S.Ct. at 170 (quoting *McGarrahan v. Mining Co.*, 96 U.S. 316, 321, 24 L.Ed. 630 (1878)). Applying this law to patents of invention, the Court held that the personal signature of the Secretary of the Interior was mandatory before the patent could issue, and that the instrument was an "uncompleted document" until the Acting Secretary of the Interior signed it, some thirteen months after the published "issue" date. *Marsh*, 128 U.S. at 612, 9 S.Ct. at 170. The *Marsh* Court affirmed the dismissal of the infringement action. *Id.* at 607, 616, 9 S.Ct. at 169, 171.

*Marsh* was decided in 1888. I have therefore considered whether subsequent changes in the patent statute, as well as the adoption of the Federal Rules of Civil Procedure and the evolution of law and administrative practices, affected the precedential force of the *Marsh* decision. I have considered whether the issuance of the '890 patent on September 19, 1989 was fatally flawed, or whether the law and practice that are today applicable permit the cure by the PTO of such flaw.

B

Not all statutory provisions are of the same weight. Failure to comply with a statutory prescription can have varying consequences, depending on the nature of the prescription and the magnitude and effect of the non-compliance. As explained by a commentator over a century ago:

When statutes direct certain proceedings to be done in a certain way or at a certain time, and a strict compliance with

these provisions of time and form does not appear essential to the judicial mind, the proceedings are held valid, though the command of the statute is disregarded or disobeyed. In these cases, by a somewhat singular use of language, the statute is said to be *directory*. In other cases the statute is held to be imperative or mandatory.

T. Sedgwick, *Interpretation and Construction of Statutory and Constitutional Law* (2d ed. 1874), pp. 316–18 (emphasis in original, footnote and citations omitted).

Modern commentary has elaborated on this distinction between mandatory and directory statutes, in the context of the burgeoning administrative state. As discussed in 2A C.D. Sands, *Sutherland Statutory Construction*, Ch. 57 "Mandatory and Directory Construction" (4th Ed.1973), when a provision in a statute instructs a governmental official in the exercise of an official duty, whether the statutory provision is directory or mandatory depends on several factors, which in turn govern the consequences of lapse by the official.

Generally put, mandatory provisions are essential to the substance of the law to which they relate. Such provisions may be ordered in the statute to be done in a certain way or at a certain time, and in no other; or their omission may incur consequences that are themselves set forth in the statute. The converse characterizes directory provisions: lack of strict compliance does not injure any substantive right, and the underlying proceeding is not invalidated by the lack of compliance. *See, e.g., In re Mother Tucker's Food Experience (Canada), Inc.*, 925 F.2d 1402, 1404 n. 3, 17 USPQ2d 1795, 1797 n. 3 (Fed.Cir.1991).

Thus the distinction between mandatory and directory statutory provisions is not simply whether the provision must be performed. More often, the distinction turns on whether the manner or time of performing the act is so critical to the statutory subject matter that any deviation can "injuriously affect" the rights of interested persons:

There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated.

*French v. Edwards*, 80 U.S. (13 Wall.) 506, 511, 20 L.Ed. 702 (1872).

Applying this reasoning to the PTO's lapse in the time and manner of affixing the official seal and the Commissioner's signature to the '890 patent, I also take into consideration that since the decision in *Marsh* there was a substantive change, or clarification, in the legal status of patent property. The Patent Act of 1952, resolving conflicting precedent, provided that "patents shall have the attributes of personal property". 35 U.S.C. § 261. This status contributes a significant distinction from the holding in *Marsh*, wherein the Court described the patent grant in terms of land patents and relied on authority governing execution of grants of real property rights. The requirements for execution of the deed have traditionally been mandatory, not directory. *See* Plucknett, *A Concise History of the Common Law* (5th ed. 1956), p. 612 (deeds for the conveyance of real property were required to be signed with enactment in England of the Statute of Frauds in 1677). But it has long been recognized, in statutory and the common law, that the rules of real property do not apply with the same rigor to personalty.

Although defining patents as personal property does not relieve the Commissioner of the statutory obligation to sign the grant, the status enacted in 35 U.S.C. § 261 is pertinent to determining the consequences of tardy signature. In *Marsh* the Court held that the personal signature of the Secretary of the Interior was mandatory, while treating other statutory require-

ments as, in effect, directory. The *Marsh* Court glossed over, in 1888, other provisions of the Patent Act of 1870 that were violated by its decision, such as section 23 which required that the patent be issued within six months of approval of the application, R.S. § 4885—for the Court's ruling delayed the effective issue date by at least thirteen months. *Marsh*, 128 U.S. at 615–16, 9 S.Ct. at 171. The Court also held that the grant would run from the date of corrected execution and, although the Act of 1870 required that the grant state the period of exclusive rights, R.S. § 4884, the Court remarked that collateral evidence could be used to determine when the grant would expire. *Marsh*, 128 U.S. at 616, 9 S.Ct. at 171.

I do not believe that Congress would today sacrifice prompt issuance and definitive expiration, for an omitted signature that is now, by statute, not required to be personally affixed by the Commissioner. The decision in *Marsh* may reflect the importance ascribed in 1888 to the statutory requirement that each patent grant be signed personally by two high government officials, one a Cabinet officer. Indeed, the patent grant had traditionally been executed at the highest levels of government: patents granted under the Patent Act of 1790 were signed by the President of the United States and the Attorney–General. Act of April 10, 1790, Ch. 7, § 1, 1 Stat. 109, 110 (1790).

While the change in the 1952 Act was undoubtedly required by the increasing numbers of issued patents, it is apparent that the placement and attestation of the Commissioner's facsimile signature are unrelated to the substance of patentability. Processing of the Commissioner's signature and mechanical affixing of the seal,[2] at the rate of some two thousand each week, are today "purely ministerial." *See Butterworth v. Hoe*, 112 U.S. 50, 68, 5

S.Ct. 25, 34, 28 L.Ed. 656 (1884) (when patentability has been decided on the merits, the duties of preparation and signature are purely ministerial). These ministerial functions do not arise until after examination of the merits of the invention has been completed and all the substantive laws of patentability have been complied with, and the inventor's entitlement to a patent has been fully established.

The final processing steps, although required by statute, are beyond the control of, or initiative of, the patentee. The text of section 153 carries no hint of a statutory intent that the patentee or public should be prejudiced by any malfunction in the PTO's internal processes. While significant rights of patentees would be prejudiced by a "mandatory" view of section 153, they are relatively unaffected by a "directory" view. In somewhat similar circumstances of Patent Office administrative lapse the court in *Western Electric Co. v. North Electric Co.*, 135 F. 79, 82 (6th Cir.1905) referred to "much disturbance of things supposed to rest on solid foundations" if the agency's delays could be the ground for invalidation of the patent by a third party in a collateral proceeding.

The view of sections 153 and 154 as directory accords with the long-standing public policy against forfeiture of substantive legal and property rights due to misfeasance or nonfeasance by a government official. Compare *Erhardt v. Schroeder*, 155 U.S. 124, 128–30, 15 S.Ct. 45, 46–47, 39 L.Ed. 94 (1894), wherein the Court held that the requirement was directory that Customs officials inspect the required percentage of bales of tobacco in a particular shipment, since failure to inspect did not seriously disadvantage the importer, with *Triangle Candy Co. v. United States*, 144 F.2d 195, 198 (9th Cir.1944), which held mandatory the requirement of the Food, Drug and Cosmetic Act that portions of

---

**2.** Lubrizol also points to the tardy application of the seal. I think, however, that the dramatic changes in legal requirements for sealed instruments supports the view of this provision as directory. From the immutable requirements of early common law, when the only way to authenticate a document was to affix a seal to it,

see 7 Wigmore, *Evidence* § 2161 (Chadbourne rev. 1978) and sources cited therein, today many states have abolished all or almost all distinction between sealed and unsealed documents. *E.g.*, Texas Rev.Civ.Stat.Ann. art. 27 (Vernon 1969). See generally Calamari and Perillo, *The Law of Contracts*, Ch. 7 (West 1987).

samples taken to monitor compliance be provided to defendants prosecuted under the act, because it directly affected the rights of the defendants.

35 U.S.C. § 153 requires that patents "shall be signed by the Commissioner or have his signature placed thereon". Section 154 requires that the patent grant be annexed to a copy of the specification and drawings. I entertain no departure from these requirements. However, these provisions do not set a "manner or time" for their performance and, as discussed in *French v. Edwards,* delay does not injuriously affect the property right to which it applies. The statute assigns no adverse consequence to the failure of the PTO to perform these functions before notice of the grant is published in the *Official Gazette.* I conclude that these provisions are directory, and lapse in timely compliance does not nullify the underlying act of patent issuance as recorded in the records of the PTO and announced in the *Official Gazette.*

C

No copy of the '890 patent was available until well after its subject matter was published in the *Official Gazette.* I have observed, *ante,* that the printing of patents is authorized by statute in terms that are permissive,[3] and that the printing delay of itself violates no statute. However, in concluding that the delay in execution here experienced, which was caused by the delay in printing, did not prejudice the patentee or the interested public, I place weight on the timely release of the *Official Gazette* of September 19, 1989.

This release announced the issuance of the '890 patent in sufficient detail to make known the patented subject matter. After publication in the *Official Gazette* the in-

vention was no longer preserved in secrecy, as required by 35 U.S.C. § 122. In *Wise v. Hubbard,* 769 F.2d 1, 226 USPQ 958 (1st Cir.1985), the court relied in part on the *Official Gazette* in dismissing plaintiff's contention that it could not have known of defendant's patent, stating that "[s]ince January 1872, the PTO has published the Official Gazette weekly which contains an abstract and one drawing from every patent issued that week." *Id.* at 3, 226 USPQ at 960.

Lubrizol has not stated that it was unaware of the subject matter of which it was charged with infringement, or prejudiced in preparing its defense, as a result of the PTO's processing of the '890 patent. One day after Lubrizol was served in the Texas action it filed a declaratory action in Ohio, asserting invalidity under §§ 102, 103, and 112, and unenforceability, assertions for which Lubrizol necessarily believed it had sufficient support when its Ohio complaint was filed, Fed.R.Civ.P. 11, despite its lack of access to the patent and its prosecution history. I conclude that the printing delay did not affect Exxon's right to enforce the '890 patent on the date of its issuance announced in the *Official Gazette.*

D

Referring to Exxon's amended complaints, Lubrizol argues that at best the amendments cured the defects as of the dates of the amendments. Thus Lubrizol argues that its Ohio declaratory action, filed on October 4, 1989, is entitled to the general rule of preference for the first-filed suit, and should go forward instead of Exxon's Texas suit. In view of my conclusion that the '890 patent indeed issued on September 19, 1989, I need not consider whether Exxon's amended complaints fall under Fed.R.Civ.P. 15(c) or 15(d), an issue pressed

---

3. **35 U.S.C. § 11(a)**
 The Commissioner may print, or cause to be printed, the following:
 1. Patents, including specifications and drawings, together with copies of the same....

* * * * * *

3. The Official Gazette of the United States Patent and Trademark Office.

by Lubrizol, or whether Lubrizol's declaratory action was subject to any disability affecting Exxon's action, an argument raised by Exxon.

The district court's injunction against prosecution of the Ohio or any other suit is in full accord with the policy disfavoring duplicative litigation, *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 729 (5th Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 133, 88 L.Ed.2d 110 (1985), and generally favoring the first-filed suit. *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 407, 169 USPQ 129, 131 (5th Cir.1971). *See generally Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081, 12 USPQ2d 1997, 1999 (Fed.Cir.1989) (discussing the general rule that the first to file is entitled to choose the forum), *citing Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200, 92 USPQ 1, 3 (1952) (discussing customer-suit exception for second-filed declaratory action).

### E

I have considered the several other issues raised by Lubrizol. Since they do not change my conclusion, they need not be treated in this concurring opinion.